**ADELBERT M. BRYAN, Appellant/Petitioner**

**v.**

**CAROLINE F. FAWKES, Appellee/Respondent, ALICIA "CHUCKY" HANSEN, Appellee/Intervenor**

S. Ct. Civil No. 2014-0046

Supreme Court of the Virgin Islands

August 28, 2014

EMILE A. HENDERSON III, ESQ., Law Offices of Yvette D. Ross-Edwards, St. Croix, USVI, *Attorney for Appellant.*

KIMBERLY L. SALISBURY, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee Caroline F. Fawkes.*

LEE J. ROHN, ESQ., Law Offices of Lee J. Rohn & Associates LLC, St. Croix, USVI, *Attorney for Appellee Alicia "Chucky" Hansen.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

(August 28, 2014)

HODGE, *Chief Justice*. Adelbert M. Bryan, the Chair of the St. Croix Board of Elections, appeals the Superior Court's July 30, 2014 order,

which dismissed, with prejudice, his petition to disqualify Alicia "Chucky" Hansen from the general election ballot for membership in the 31st Legislature. For the reasons that follow, we reverse.

## I. BACKGROUND

The facts of this case are undisputed. On May 3, 2007, the United States Attorney for the District of the Virgin Islands filed an indictment against Hansen in the District Court of the Virgin Islands, charging her with several offenses, including willful failure to file an income tax return with the Virgin Islands Bureau of Internal Revenue, in violation of title 33, section 1524 of the Virgin Islands Code.[1] After numerous proceedings, the U.S. Attorney filed a third superseding indictment on November 7, 2008, charging Hansen with four counts of willful failure to file — representing the 2002, 2003, 2004, and 2006 tax years — and one count of filing a false return with respect to the 2005 tax year.

A jury trial began on December 8, 2008, which resulted in Hansen's conviction for three counts of willful failure to file an income tax return for the 2002, 2003, and 2004 tax years, all of which were misdemeanors because section 1524 establishes a maximum incarcerative penalty of not more than one year's imprisonment.[2] The District Court held a sentencing hearing on May 28, 2009, and orally sentenced Hansen to a one-year term of suspended incarceration and one year of probation for each of her three convictions, to be served consecutively. Shortly thereafter, the District Court memorialized its sentence in a June 10, 2009 judgment. Hansen did not appeal her convictions to the United States Court of Appeals for the Third Circuit, nor did she file any post-verdict motions for judgment of acquittal, new trial, or similar relief. Notably, to date, Hansen has not been pardoned for her convictions.

---

[1] Although these are crimes under the Virgin Islands Code, pursuant to the Revised Organic Act of 1954, "[t]he District Court of the Virgin Islands shall have exclusive jurisdiction over all criminal and civil proceedings in the Virgin Islands with respect to the income tax laws applicable to the Virgin Islands, regardless of the degree of the offense or of the amount involved." 48 U.S.C. § 1612(a); see also 48 U.S.C. § 1397 ("The income-tax laws in force in the United States of America and those which may hereafter be enacted shall be held to be likewise in force in the Virgin Islands of the United States, except that the proceeds of such taxes shall be paid into the treasuries of said islands.").

[2] See 14 V.I.C. § 2(b)(1) ("[A] felony is a crime or offense which is punishable by imprisonment for more than one year, and every other crime or offense is a misdemeanor.").

Pursuant to section 6(b) of the Revised Organic Act of 1954, "[n]o person shall be eligible to be a member of the legislature . . . who has been convicted of a felony or of a crime involving moral turpitude and has not received a pardon restoring his civil rights." 48 U.S.C. § 1572(b). Despite her misdemeanor convictions, Hansen was certified as a candidate for the 29th Legislature from the District of St. Croix, was elected to that office in November 2010, and was sworn in as a member of the 29th Legislature in January 2011. The District Court, in a June 22, 2012 order, noted that Hansen completed her period of supervised release on May 27, 2012, and accordingly discharged Hansen from probation. That same year, Hansen ran for election to the 30th Legislature, and was sworn in as one of its members in January 2013.

On May 7, 2014, Bryan, in his capacity as Chair of the St. Croix Board of Elections, wrote a letter to Carolyn F. Fawkes, the Supervisor of Elections. In his letter, Bryan advised Fawkes that as the Supervisor, she must "do . . . due diligence in full compliance with the appropriate federal and Virgin Islands laws as they relate to assisting and conducting fair and transparent elections in the Virgin Islands," including "[v]alidation and vetting of persons to be elected to the Virgin Islands Legislature." (J.A. 25.) Bryan further wrote that "[p]resently, a member of our Virgin Islands Legislature was not legally validated and vetted to be on the election ballot[s] in 2010 and 2012," and that "the candidate was improperly and illegally sitting" as a member of the Legislature. (J.A. 25-26.) Bryan concluded his letter by stating that he was "officially reminding" Fawkes that she must engage in "the validating and vetting of Alicia 'Chucky' Hansen and any other candidate to be on the ballot of election to the Legislature," and notifying her that his letter serves as a "formal complaint pursuant to 18 V.I.C. § 411." (J.A. 26.)

Fawkes, in a May 12, 2014 letter, replied to Bryan by stating that she is "aware of [her] duties and responsibilities," that she would "review the Case File and all court related documents," and promptly issue a formal response to his complaint. (J.A. 27.) On May 13, 2014, Hansen filed nomination papers in support of her candidacy for membership in the 31st Legislature. The next day, Fawkes wrote a letter to Bryan stating that she reviewed Hansen's nomination papers, and concluded that she meets the qualifications to serve as a Senator. Fawkes further advised Bryan of his right, under section 412 of title 18 of the Virgin Islands Code, to file a petition objecting to her decision with the Superior Court.

210

Bryan filed his petition in the Superior Court on May 19, 2014. In his petition, Bryan argued that Fawkes erred in certifying Hansen as a candidate for membership in the 31st Legislature because her three convictions for willful failure to file income tax returns constitute "crime[s] involving moral turpitude" within the meaning of section 6(b) of the Revised Organic Act. As relief, Bryan requested that the Superior Court set aside Fawkes's decision to certify Hansen's candidacy.

On June 4, 2014, Hansen filed a motion to intervene in the litigation, along with a motion to dismiss for lack of subject matter jurisdiction. Although Bryan opposed Hansen's motion to intervene, the Superior Court, in a June 18, 2014 order, granted the motion to intervene, and directed Bryan to respond to Hansen's motion to dismiss within 21 days. On July 1, 2014, Fawkes moved to dismiss Bryan's petition, and filed an amended motion on July 2, 2014, both of which addressed the claims in Bryan's petition on the merits.

Without holding a hearing or issuing any other orders, the Superior Court issued a final judgment on July 30, 2014. In that decision, the Superior Court rejected Hansen's jurisdictional arguments, but agreed with Fawkes that Hansen was eligible to serve in the 31st Legislature because her convictions were not for "crime[s] involving moral turpitude." 48 U.S.C. § 1572(b). Consequently, the Superior Court dismissed Bryan's petition with prejudice.

Bryan timely filed his notice of appeal with this Court on August 4, 2014, and on August 5, 2014, filed a motion to expedite this appeal due to the impending federal deadline to prepare, approve, print, and mail absentee ballots to military personnel for the November 2014 general election. This Court granted the motion on the same day, and issued an expedited briefing and oral argument schedule.

## II. JURISDICTION

This Court possesses jurisdiction over this appeal pursuant to title 4, section 32(a) of the Virgin Islands Code, which vests us with jurisdiction over "all appeals arising from final judgments, final decrees, [and] final orders of the Superior Court." Because the Superior Court's July 30, 2014 order dismissed Bryan's petition with prejudice, it is clearly a final judgment over which we may exercise jurisdiction. *Pichierri v. Crowley*, 59 V.I. 973, 977 (V.I. 2013) (order granting motion to dismiss, resulting in dismissal of case with prejudice, is a final order from which an appeal

lies under 4 V.I.C. § 32(a)). Nevertheless, in her appellate brief, Hansen raises several jurisdictional and non-jurisdictional challenges to this Court's consideration of Bryan's appeal. We address each claim in turn.

## A. Separation of Powers

█ The Revised Organic Act "divides the power to govern the territory between a legislative branch, an executive branch, and a judicial branch," reflecting that "Congress 'implicitly incorporated the principle of separation of powers into the law of the territory.'" *Kendall v. Russell*, 572 F.3d 126, 135, 52 V.I. 1021 (3d Cir. 2009) (quoting *Smith v. Magras*, 124 F.3d 457, 465, 37 V.I. 464 (3d Cir. 1997)) (citations omitted). Thus, "unless otherwise expressly provided or incidental to the powers conferred, the Legislature cannot exercise either executive or judicial power; the executive cannot exercise either legislative or judicial power; [and] the judiciary cannot exercise either executive or legislative power." *Springer v. Gov't of the Philippine Islands*, 277 U.S. 189, 201-02, 48 S. Ct. 480, 72 L. Ed. 845 (1928).

█ As Hansen correctly notes, section 6(g) of the Revised Organic Act provides that "[t]he legislature shall be the sole judge of the elections and qualifications of its members." 48 U.S.C. § 1572(g). According to Hansen, this provision vests the Virgin Islands Legislature with the exclusive authority to enforce section 6(b)'s prohibition on felons and those convicted of crimes involving moral turpitude from serving as a Senator. As a result, Hansen argues, neither the Superior Court nor this Court possesses the authority to determine her eligibility to serve as a member of the 31st Legislature. Although Hansen frames her separation of powers argument in jurisdictional terms, the Supreme Court of the United States has expressly held that a claim that a particular action is barred by the separation of powers doctrine does not go to subject matter jurisdiction, but to whether the claim is justiciable, i.e., whether a court should refrain from deciding the matter even though it has the jurisdiction to do so. *Powell v. McCormack*, 395 U.S. 486, 511-12, 89 S. Ct. 1944, 23 L. Ed. 2d 491 (1969).

█ In any case, we disagree with Hansen that the separation of powers doctrine bars Bryan's action. "The Virgin Islands Legislature is not a continuing body; it is a political branch of government whose members are elected to two-year terms, with the entire body standing for election in even-numbered years." *Garcia v. Garcia*, 59 V.I. 758, 775 (V.I. 2013).

Thus, the current legislature — the 30th Legislature — is distinct from the 29th Legislature that preceded it, and the 31st Legislature that will succeed it. While the 30th Legislature is "the sole judge of the elections and qualifications of its members," it lacks the power to judge the qualifications of candidates for the 31st Legislature.[3] *Accord Richards v. Jones*, 47 V.I. 197, 201 (V.I. Super. Ct. 2005) (holding, notwithstanding section 6(g), that the 25th Legislature "has no authority to impose punishment that exceeds its life") (citing *Powell*). And since the 31st Legislature will not come into existence until January 2015, *see* 48 U.S.C. § 1572(a), it, too, is presently without power to adjudicate the issue of Hansen's eligibility.

██ ██ Importantly, the Revised Organic Act is not silent as to which entity has the power to address such matters. Section 6(c) requires the creation of boards of elections, and provides that the members of such boards "shall be popularly elected." 48 U.S.C. § 1572(c). It further provides that "[a]ll officers and employees charged with the duty of directing the administration of the electoral system of the Virgin Islands and its representative districts shall be appointed in such manner as the legislature may by law direct." *Id.* Moreover, the Revised Organic Act establishes a judicial branch, and interpreting a statute — such as section 6(b) — "is a familiar judicial exercise." *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427, 182 L. Ed. 2d 423 (2012). Given that the Revised Organic Act provides for the existence of elected boards of elections, authorizes the legislature to establish laws with respect to those boards, and establishes a system for judicial review, the power to determine whether a candidate meets the minimum qualifications for office so as to appear on

---

[3] At oral argument, Hansen, through her counsel, argued that the 29th and 30th Legislatures, by failing to remove her from office, had deemed her qualified to serve as a Senator. As noted above, the 31st Legislature is distinct from the 29th and 30th Legislatures, and has not yet come into existence. In any event, the fact that the 29th and 30th Legislatures did not proactively initiate expulsion proceedings against Hansen is not tantamount to an affirmation by those bodies that Hansen's convictions were not for "crime[s] involving moral turpitude" as contemplated by section 6(b) of the Revised Organic Act. *Accord Garcia*, 59 V.I. at 775 ("The fact that the 16th through 30th Legislatures have taken no direct action to respond to [a judicial] decision is wholly irrelevant to the question of whether [that court] properly interpreted [a Virgin Islands statute]."); 2B NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 49:9 & n.2 (7th ed. 2012) ("[L]egislative inaction also has been called 'a weak reed upon which to lean' and a 'poor beacon to follow' to construe a statute.") (collecting cases).

a general election ballot is clearly not exclusive to the legislature. *See Kendall*, 572 F.3d at 135-36 ("[T]he separation of powers principle prohibits any branch of government from exercising powers that are reserved for the other branches, unless such an exercise is *expressly provided* or incidental to the powers that a branch necessarily has." (emphasis added; internal quotation marks omitted)). For this same reason, we reject Hansen's claim that the power to judge the qualifications of its membership is a non-delegable power of the legislature, given that section 6(c) specifically authorizes the legislature to make laws concerning the elected board of elections.

■ Additionally, we note that almost all state constitutions contain nearly identical language to that found in section 6(b) of the Revised Organic Act. *See* Paul E. Salamanca & James E. Keller, *The Legislative Privilege to Judge the Qualifications, Elections, and Returns of Members*, 95 KY. L.J. 241, 243-44 & n.7 (2007) (collecting authorities). The Nevada Supreme Court, in interpreting similar language in the Nevada Constitution, expressly rejected the contention that separation of powers principles require elections officials to place the names of all candidates on the general election ballot without regard to whether they meet the minimum qualifications for the office they seek:

> Petitioners also contend that whether they be legally qualified or not, still the respondent Clerk should be required to place their names on the ballots, and defer any decision of whether they should sit to the determination of the legislative body they desire to serve. The only support offered for this contention is Article 4, Section 6, of our Constitution which provides: 'Each House shall judge of the qualifications, elections and returns of its own members'. In other words, it seemingly is petitioners' position that although a would-be candidate is admittedly disqualified to serve for one or a dozen reasons, election officials must place his name on the ballot; that he may seek the preference of the voters over qualified candidates; and that if he attracts sufficient votes, then the House in which he seeks to serve may seat him, if it chooses. We reject this contention.

*Mengelkamp v. List*, 88 Nev. 542, 501 P.2d 1032, 1033-34 (1972). The Mis-

214

souri Supreme Court, too, reached the same decision in interpreting a similar provision of the Missouri Constitution:

> [T]he position of respondents is that the entire election process of members of the General Assembly, including examination of whether prospective candidates for the nomination possess constitutionally mandated qualifications, is to be examined and passed upon only by the appropriate legislative body, and that the courts have no jurisdiction whatsoever in this area. This, say respondents, is the scope and meaning of Article III, § 18, of the Constitution.
>
> This interpretation of the constitutional provision would mean that a 15-year-old resident of Illinois could file a declaration of candidacy for State Senator in Missouri, and even though the facts were undisputed, the courts could do nothing to prevent his name from appearing on the ballot. Respondents say that the solution rests only in the hands of the electorate and the body in which the particular person seeks membership. Likewise, if a Primary Election was held and there were widespread charges of counting and voting fraud, the courts, according to the position of respondents, would be unable to accept and hear a Primary Election contest under the Primary Election contest statutes adopted by the General Assembly.
>
> We do not accept respondents' interpretation of the scope of Article III, § 18. In our view, it applies when a General Election has been held and one then presents himself for membership, and, of course, it also applies in instances after the person has been seated and [a] question as to his qualifications and right to remain a member arises.

*State ex rel. Gralike v. Walsh*, 483 S.W.2d 70, 73 (Mo. 1972). In other words, because section 6(g) of the Revised Organic Act and similar provisions in the constitutions of other jurisdictions refer to *members* of the legislature, and say nothing of *candidates* for the legislature, the power to review the qualifications of those candidates rests with election officials and the courts. *See Stephenson v. Woodward*, 182 S.W.3d 162, 168 (Ky. 2005) (because a candidate elected to the state senate had yet to take office, "reliance on cases dealing with this Court's refusal to interfere with the General Assembly's exclusive authority to pass on the qualifications of its *members* is clearly misplaced" (emphasis in original)). Even the United States Supreme Court,

in interpreting the comparable provision in the United States Constitution,[4] has declined to adopt the position advanced by Hansen in this appeal. *See Nixon v. United States*, 506 U.S. 224, 237, 113 S. Ct. 732, 122 L. Ed. 2d 1 (1993) ("The decision as to whether a Member satisfied [the constitutional] qualifications [for office] was placed with the House, but the decision as to what these qualifications consisted of was not.").

■ Consistent with section 6(c), the legislature established the St. Thomas-St. John Board of Elections and the St. Croix Board of Elections, *see* 18 V.I.C. § 41, authorized those boards, acting jointly, to hire a Supervisor of Elections, *see* 18 V.I.C. § 4(a), vested the Supervisor of Elections, subject to the authority of the pertinent boards of elections, to "certify . . . for primaries and elections, the names of candidates for all public and territorial offices and membership on party committees," 18 V.I.C. § 4(b)(2), and to "disqualify such candidate and delete the candidate's name from the ballot" if "the Supervisor determines that a candidate for election or nomination does not meet the qualifications established by law for the office." 18 V.I.C. § 411(b). Moreover, the legislature expressly provided for judicial review of such determinations. 18 V.I.C. § 412.

■ Thus, section 6(c) of the Revised Organic Act, as well as the local statutes enacted by the legislature pursuant to that provision, contemplates that an elected Board of Elections will administer the elections system — including enforcing the requirements of section 6(b) — before a particular legislature convenes, and that power will shift from the Board of Elections to that legislature pursuant to section 6(g) only after the election has concluded and that legislature has actually convened. In fact, the District Court of the Virgin Islands, in adjudicating a similar challenge to an individual's eligibility to serve as a Senator due to a failure to meet the qualifications established in section 6(b), interpreted sections 6(b), 6(c), and 6(g) in this very manner:

> In this case involving Mr. Mapp, his alleged ineligibility to sit in the legislature was not discovered until after he was sworn in and became an incumbent. Ordinarily, a decision on whether a person is qualified to be a registered voter, a candidate for public elective office, or a per-

---

[4] "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." U.S. CONST. art. I, § 5, cl. 1.

son successfully elected and thus entitled to be so certified, is statutorily placed in the hands of the Boards of Elections for the districts. Title 18 of the Virgin Islands Code covers all aspects of these matters.

But when it comes to determining the eligibility of sitting members of the legislature, the responsibility shifts from the Boards of Elections to the legislature itself. It is well settled that a constitutional provision of the kind quoted above, which gives the legislature "sole" power to determine the "qualifications" of its members, vests that legislature with exclusive power over the actions covered and generally even deprives courts of jurisdiction. 72 AM. JUR. 2D *States, Territories, and Dependencies* § 44, nn. 71, 78 (1984). This "sole" authority has some limitations which we shall discuss *infra*.

. . . .

In this case, the legislature has not yet acted. This is understandable, because at first blush, it might appear that the power to make a determination rests with the Boards of Elections. But as pointed out earlier, this power passes to the legislature when a person takes his or her seat in that body.

Of course, the Boards of Elections remain the entities which determine whether a person is statutorily eligible to seek elective office in the future under the various sections of title 18 of the Virgin Islands Code. Even present incumbents must qualify before the Boards of Elections in the election to the next legislature. They will still have a major role to play.

*Legislature of the V.I. v. Mapp*, 24 V.I. 304, 305-07 (D.V.I. 1989). And while Hansen heavily relies on *Mapp v. Lawaetz*, 882 F.2d 49 (3d Cir. 1989) — a subsequent case filed after the legislature, in response to the District Court decision, actually expelled the Senator from office — even that case supports this construction of sections 6(b), 6(c), and 6(g), in that the United Court of Appeals for the Third Circuit acknowledged that the Board of Elections could not withdraw its prior certification of the candidate because the fact that the candidate did not satisfy the qualifications set forth in section 6(b) was not discovered until after the 18th Legislature convened and the candidate had been sworn into office as a Senator, thus causing enforcement power to transfer from the Board of Elections to the 18th Legislature. *See id.* at 51. Accordingly, we conclude that nothing in the Revised Organic Act prohibits the Superior Court from exercising its powers under section 412

of title 18 of the Virgin Islands Code[5] to independently review a certification decision.[6]

## B. Superior Court Jurisdiction

Hansen also argues that the Superior Court lacked jurisdiction over Bryan's petition because the statute authorizing judicial review of a certification decision rendered by the Supervisor of Election purportedly requires that the petition be filed with the federal District Court rather than with the Virgin Islands Superior Court. That statute provides, in pertinent part, as follows:

---

[5] While not determinative to our analysis, we also note that the power of the Supervisor of Elections to certify a candidate pursuant to section 411, and the Superior Court's power to review that certification decision pursuant to section 412, applies to all elected positions in the Virgin Islands government. In addition to an elected legislature, the Virgin Islands has an elected governor and lieutenant governor, elected delegate to Congress, elected board of education, elected boards of election, and, in the past, has had elected delegates to constitutional conventions. The Revised Organic Act, however, does not vest the legislature — or any other entity for that matter — with authority to judge the qualifications of candidates for those offices, and thus it is unquestionable that the courts may review the acts of the Supervisor of Elections with respect to those offices. *See, e.g., St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 328-29 (V.I. 2007); *Coffelt v. Fawkes*, 765 F.3d 197, 201 (3d Cir. 2014). To adopt Hansen's position would render the office of Senator the only elected position in the entire Virgin Islands government in which candidates for the office are completely immune from scrutiny by either the boards of elections or the judiciary.

[6] In her appellate brief, Hansen also alleges that the question of her eligibility to serve as a member of the 31st Legislature is a non-justiciable political question. The political question doctrine, however, does not apply to state courts, and Hansen has provided this Court with no legal argument as to why this Court should incorporate this federal standard into Virgin Islands jurisprudence. *See Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 91 (Iowa 2014) ("[T]he United States Supreme Court has made clear that the federal political question doctrine does not apply to state courts.") (collecting cases); *Backman v. Secretary*, 387 Mass. 549, 441 N.E.2d 523, 527 (1982) ("[W]e have never explicitly incorporated the [political question] doctrine into our State jurisprudence. . . . [T]his court has an obligation to adjudicate claims that particular actions conflict with constitutional requirements."). In any case, even if this Court were inclined to adopt the political question doctrine, Hansen's sole argument in favor of its application is her argument that the Revised Organic Act vests the certification of candidates for the legislature exclusively with the legislature. Given that the Revised Organic Act contemplates that the board of elections, and not the legislature, will administer elections, we cannot say that this case involves "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962); *see also Zivotofsky*, 132 S. Ct. at 1427 ("[C]ourts cannot avoid their responsibility merely 'because the issues have political implications.' " (quoting *I.N.S. v. Chadha*, 462 U.S. 919, 943, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983))).

All nomination petitions and nomination papers received and filed under this chapter, and accepted after the examination required by section 411 of this title, shall be deemed to be valid, unless, within five days after the last day for filing such nomination petition or papers, a petition is presented to *the district court*, specifically setting forth the objections thereto, and praying that such petition or paper be set aside.

18 V.I.C. § 412[7] (emphasis added). According to Hansen, the reference to the District Court allegedly demonstrates an intent by the legislature to have "the sole avenue of judicial review run[] solely through the District Court." (Hansen Br. 19.)

Hansen's argument lacks merit. Until 1991, the District Court possessed "original jurisdiction over purely local civil matters." *Parrott v. Gov't of the V.I.*, 230 F.3d 615, 620, 43 V.I. 277 (3d Cir. 2000). However, in 1991, the legislature, acting pursuant to its authority under the Revised Organic Act, amended section 76(a) of title 4 of the Virgin Islands Code to vest the Superior Court with original jurisdiction over all civil actions. This enactment by the legislature implicitly repealed virtually all[8] pre-1991 references to the District Court and vested that jurisdiction with the Superior Court. *In re Reynolds*, 60 V.I. 330, 333 n.3 (V.I. 2013); *In re Rogers*, 57 V.I. 553, 558 n.1 (V.I. 2012); *Beachside Associates, LLC v.*

---

[7] Fawkes, in her appellate brief, also argues that Bryan's petition was untimely because the last day for filing a nomination petition or paper was May 13, 2014, and Bryan did not file his petition with the Superior Court until six days later, on May 19, 2014, thus violating section 412's requirement that such a petition be filed "within five days after the last day for filing such nomination petition or papers." Fawkes, however, ignores that the fifth day — May 18, 2014 — fell on a Sunday, and therefore the statutory limitations period was automatically extended to Monday May 19, 2014, rendering Bryan's petition timely filed. *See* 1 V.I.C. § 171(a) ("The following days are legal holidays in the Virgin Islands: Every Sunday . . . ."); 1 V.I.C. § 171(c) ("Whenever any act is appointed by law or contract to be performed upon a particular day, which day falls upon a holiday, that act may be performed upon the next business day with the same effect as if it had been performed upon the day appointed.").

[8] Notwithstanding the expansion of the Superior Court's local jurisdiction and the corresponding reduction in the District Court's jurisdiction over those matters, some actions arising under local law may nevertheless be tried in the District Court. For instance, as noted earlier, the District Court continues to possess "exclusive jurisdiction over all criminal and civil proceedings in the Virgin Islands with respect to the income tax laws applicable to the Virgin Islands." 48 U.S.C. § 1612(a). Similarly, the District Court may exercise supplemental criminal jurisdiction when a local crime relates to a federal crime. *See United States v. Gillette*, 738 F.3d 63, 70-73, 60 V.I. 855 (3d Cir. 2013) (citing 48 U.S.C. § 1612(c)).

*Fishman*, 54 V.I. 418, 420 n.3 (V.I. 2010); *Gov't of the V.I. v. Crooke*, 54 V.I. 237, 246-47 (V.I. 2010); *Parrott*, 230 F.3d at 620; *Callwood v. Enos*, 230 F.3d 627, 632, 43 V.I. 293 (3d Cir. 2000). Moreover, even if the legislature desires for the District Court to hear such actions, it is well established that, having exercised its authority under the Revised Organic Act to divest the District Court of its original jurisdiction over purely local actions, the legislature does not possess the authority to undo that action by divesting local courts of jurisdiction over those local actions and returning that jurisdiction to the District Court. *Kendall*, 572 F.3d at 132 (citing *Estate of Thomas Mall, Inc. v. Territorial Court of the V.I.*, 923 F.2d 258, 261 (3d Cir. 1991)). Because section 412 was enacted well before 1991, and the legislature in any event lacks the authority to confer the District Court with jurisdiction over purely local matters, the Superior Court, and not the District Court, unquestionably possesses jurisdiction over Bryan's petition.[9]

## C. Standing

Hansen further contends that Bryan lacked standing to file his petition with the Superior Court or to bring this appeal in this Court because he did not suffer any cognizable injury or harm from Fawkes's decision to certify Hansen's candidacy. Hansen, citing exclusively to federal cases interpreting Article III of the United States Constitution, contends that allowing such "generalized grievances" to proceed to a decision on the merits would "simply open the floodgates of litigation to any proverbial

---

[9] We recognize that, on September 19, 2012, several individuals initiated a civil action in the District Court against John Abramson, the then-Supervisor of Elections, requesting that it remove Hansen from the general election ballot for membership in the 30th Legislature on grounds that the government's failure to remove Hansen from the ballot despite her convictions violated 42 U.S.C. § 1983, and that those same individuals then filed a motion for a temporary restraining order on October 30, 2012, which the District Court denied in an unpublished November 1, 2012 Order. *Clark v. Abramson*, No. 1:12-cv-00096, slip op. at 3 (D.V.I. Nov. 1, 2012) (unpublished). We note, however, that the District Court exercised its jurisdiction over this action not through 18 V.I.C. § 412, but pursuant to 48 U.S.C. § 1612(a) which vests the District Court with the "the jurisdiction of a District Court of the United States," including "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, such as 42 U.S.C. § 1983. Notably, neither the November 1, 2012 Order denying the motion for temporary restraining order, nor the March 10, 2013 opinion and order dismissing the case as moot, ever addressed the merits of Hansen's eligibility to serve as a Senator pursuant to section 6(b) of the Revised Organic Act. ·

'birther' who wants an easy way to harass a candidate outside the political process."[10] (Hansen Br. 22 (citing *Kerchner v. Obama*, 612 F.3d 204, 209-10 (3d Cir. 2010).)

■■■ We note that Hansen herself does not possess standing to challenge Bryan's standing. As we noted earlier, Hansen was not originally a party to the Superior Court proceedings; rather, she became involved in the litigation only after the Superior Court granted her motion to intervene pursuant to Federal Rule of Civil Procedure 24.[11] We recognize that, in most cases, "[o]nce a court grants intervention . . . , the 'intervenor is treated as if [it] were an original party and has equal standing with the original parties.' " *In re Bayshore Ford Trucks Sales, Inc.*, 471 F.3d 1233, 1246 (11th Cir. 2006) (quoting *Marcaida v. Rascoe*, 569 F.2d 828, 831 (5th Cir. 1978)). Nevertheless, an intervenor "may argue only the issues raised by the principal parties and may not enlarge those issues." *Southwestern Pa. Growth Alliance v. Browner*, 121 F.3d 106, 121 (3d Cir. 1997). This is because the United States Supreme Court has instructed that "an intervenor is admitted to the proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues or compel an alteration of the nature of the proceeding." *Vinson v. Washington Gas Light Co.*, 321 U.S. 489, 498, 64 S. Ct. 731, 88 L. Ed. 883 (1944)). Thus, "[i]ntervenors . . . simply lack standing to expand the scope of the case to matters not [otherwise] addressed." *Nat'l Ass'n of Regulatory Util. Comm'rs v. Interstate Commerce Comm'n*, 41 F.3d 721, 729, 309 U.S. App. D.C. 325 (D.C. Cir. 1994). Accordingly, courts have consistently held that an intervening defendant may not assert an affirmative defense that has been waived by the original defendant. *See, e.g., Independent Elec. Contractors of Houston, Inc. v. N.L.R.B.*, 720 F.3d 543, 551 (5th Cir. 2013) (an intervenor may not raise affirmative defense of exhaustion of remedies when original defendant failed to raise it); *United States v. Metropolitan St. Louis Sewer Dist.*, 952 F.2d 1040,

---

[10] The term "birther," as used in Hansen's brief, appears to refer to a series of lawsuits filed in federal court by individuals asserting that President Barack Obama was not born in the United States, and requesting relief ranging from disqualification from state ballots, annulment or postponement of electoral college results, or removal from office. *See Berg v. Obama*, 586 F.3d 234, 239 n.4 (3d Cir. 2009) (collecting cases).

[11] Federal Rule of Civil Procedure 24 applies in the Superior Court pursuant to Superior Court Rule 7 "because no Virgin Islands statute or court rule addresses intervention as of right in this instance." *In re Q.G.*, 60 V.I. 654, 660 n.7 (V.I. 2014).

1043 (8th Cir. 1992) ("[T]he intervenors have no standing to raise the defense of res judicata to the federal consent decree. This defense, if it is available at all, may be raised only by [the original defendant]. [The original defendant]'s decision not to assert this defense does not give the intervenors standing to raise it, as a party may assert a third party's rights only if, inter alia, the third party is unable to assert its own rights, a condition not present here.") (citing *Singleton v. Wulff*, 428 U.S. 106, 115-16, 96 S. Ct. 2868, 49 L. Ed. 2d 826 (1976)); *Lake Tahoe Watercraft Recreation Ass'n v. Tahoe Reg'l Planning Agency*, 24 F. Supp. 2d 1062, 1067 (E.D. Cal. 1998) ("The [intervenor] is prohibited from raising a statute of limitations defense. An intervenor is limited to the field of litigation open to the original parties; it cannot enlarge the issues tendered by or arising [from] plaintiff's bill.").

 ██ It is now well established that standing is not a jurisdictional doctrine in Virgin Islands local courts, but — at best — represents a claims-processing rule that is waived if not asserted by the defendant. *Malloy v. Reyes*, 61 V.I. 163, 171 n.4 (V.I. 2014); *In re Q.G.*, 60 V.I. 654, 659 n.5 (V.I. 2014); *Benjamin v. AIG Ins. Co. of. P.R.*, 56 V.I. 558, 564-65 (V.I. 2012). In this case, the original respondent — Fawkes — affirmatively told Bryan, in her May 14, 2014 letter, that he could challenge her decision to certify Hansen by filing a petition with the Superior Court. And when Bryan then filed that petition, Fawkes did not challenge his standing in her original or amended motions to dismiss, but instead chose to defend her decision to certify Hansen's candidacy on the merits. Similarly, Fawkes has not, in her appellate brief, challenged Bryan's standing to bring this appeal. Consequently, Fawkes has, through both action and inaction, unquestionably waived any challenge to Bryan's standing. *In re Guardianship of Smith*, 54 V.I. 517, 524 n.5 (V.I. 2010). As a result, Hansen is precluded from resurrecting Fawkes's waived standing defense. *See Nat'l Ass'n of Regulatory Util. Comm'rs*, 41 F.3d at 729; *Metropolitan St. Louis Sewer Dist.*, 952 F.2d at 1043.[12]

---

[12] Nevertheless, even if this Court were inclined to permit Hansen to assert a standing defense that Fawkes has already waived, we would conclude that Bryan has unquestionably established standing. Section 412 of title 18 of the Virgin Islands Code, which authorizes judicial review of certification decisions, simply requires that a petition be filed within five days, without providing any limitations on who may file such a petition. While Hansen contends that the legislature could have included the phrase "any individual" to signify that it

## III. DISCUSSION

Having addressed Hansen's jurisdictional and non-jurisdictional challenges to this appeal and the underlying Superior Court proceeding, we may now turn to the merits of the Superior Court's July 30, 2014 order. However, before we consider the question of whether the Superior Court correctly concluded that Hansen was not convicted of a "crime involving moral turpitude,"[13] we must ascertain the appropriate standard of review.

### A. Standard of Review

Ordinarily, this Court applies a plenary standard of review with respect to pure questions of law. *Blyden v. People*, 53 V.I. 637, 646-47 (V.I. 2010). However, in their respective briefs, Fawkes and Hansen both contend that this Court should grant deference to Fawkes's determination[14] that the offense of willful failure to file an income tax return is not a crime of moral turpitude. To support this claim, they cite to the decision of the Supreme Court of the United States in

---

desired not to impose any standing requirements, this Court has previously held that statutes which are silent as to who has standing should be broadly interpreted to confer standing. *V.I. Narcotics Strike Force v. Pub. Emps. Relations Bd.*, 60 V.I. 204, 212 (V.I. 2013) ("[W]e disagree that the absence of any explicit language in section 530a of title 3 granting the PERB the authority to initiate an enforcement action is of any jurisdictional significance.").

[13] In his appellate brief, Bryan notes that the Superior Court committed error by failing to comply with several critical deadlines established by 18 V.I.C. § 412, which required it to (1) hold a hearing on the petition within ten days, and (2) issue a decision within fifteen days of the hearing date. Indeed, Fawkes concedes that the Superior Court failed to comply with section 412, in that it never held a hearing and waited two-and-a-half months to issue a judgment on Bryan's petition. Bryan and Fawkes, however, both contend that the Superior Court's failure to comply with these requirements is harmless, in that the facts of this case are completely undisputed and the sole issue involves a pure question of law. Thus, Bryan and Fawkes both urge this Court to resolve this issue on the merits rather than remanding the matter to the Superior Court for a hearing, because a remand under these circumstances would do nothing except result in further delay and expense. We agree, and therefore proceed to the merits notwithstanding the Superior Court's procedural errors. *See* V.I.S.CT.R. 4(i).

[14] Under Virgin Islands statutory law, "[t]he Supervisor of Elections, *subject to the direction, control and supervision of the boards of elections*," shall have the power to "certify to the boards of elections, for primaries and elections, the names of candidates for all public and territorial offices and membership on party committees." 18 V.I.C. § 4(b)(2) (emphasis added). As such, we strongly question whether a decision of the Supervisor of Elections, acting alone, would be entitled to any deference even under the doctrine announced in *Chevron*. However, in light of our ultimate holding that *Chevron* does not apply to Virgin Islands administrative agencies, we need not address this issue as part of this appeal.

223

*Chevron, U.S.A., Inc. v. Natural Res Def. Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). While Bryan contends that Fawkes's determination of Hansen's eligibility is entitled to no deference, even he concedes that *Chevron* is applicable to this matter. It is well established, however, that parties may not explicitly or implicitly stipulate to the law. *Murrell v. People*, 54 V.I. 338, 348 (V.I. 2010). Therefore, rather than blindly follow the suggestion of the parties, we must independently determine whether such deference is warranted in the Virgin Islands.[15] *See Billu v. People*, 57 V.I. 455, 471 (V.I. 2012) ("Although the tenets of statutory construction applied to federal statutes by the U.S. Supreme Court may be highly persuasive, they do not bind this Court in its interpretation of statutes passed by the Virgin Islands Legislature."); *accord Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 92 (Iowa 2014) (independently analyzing whether to apply federal political question doctrine to Iowa state court even though the parties "do not question whether the political question doctrine applies in state court" and did not propose any alternate standards).[16]

---

[15] In her brief and at oral argument, Fawkes asserts that this Court, in *Gov't of the V.I. v. Crooke*, 54 V.I. 237, 256 (V.I. 2010), purportedly extended *Chevron* deference to decisions rendered by Virgin Islands administrative agencies. However, the passage in *Crooke* cited by Fawkes simply acknowledged the *Chevron* decision prior to holding that deference was not appropriate and proceeding to review the agency's interpretation *de novo*, ultimately concluding that the agency "clearly misinterpreted" the statute. That this Court acknowledged *Chevron*'s existence by citing to it in an opinion, but in the same opinion declined to apply its principal holding, is certainly not evidence that this Court intended to extend *Chevron* to the Virgin Islands. *See Thomas v. V.I. Bd. of Land Use Appeals*, 60 V.I. 579, 591 n.10 (V.I. 2014) (rejecting claim that this Court adopted Restatement (Third) of Property: Servitudes in a prior case simply by acknowledging its existence); *cf. Walters v. Walters*, 60 V.I. 768, 777 n.11 (V.I. 2014) ("This citation to the Restatement [in a prior case] was not necessary to the result in that case, and therefore was merely dictum.") (citing *Lander v. Schundler*, 168 F.3d 92, 98 n.6 (3d Cir. 1999)).

[16] Although Bryan and Hansen solely discuss *Chevron* deference, Fawkes, in her brief, notes, in a fleeting manner, that her decision may be entitled to a lesser form of deference announced by the United States Supreme Court in *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944), in which administrative agency determinations not entitled to *Chevron* deference must nevertheless receive "respect" from a reviewing court based on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Id.* at 140. To the extent Fawkes has not waived her reliance on *Skidmore* by asserting it in a perfunctory manner, *see* V.I.S.CT.R. 22(m), the same considerations that cause us to reject *Chevron* also lead us to decline to extend *Skidmore* to the Virgin Islands.

■■■ In *Chevron*, the United States Supreme Court held that when a court reviews a federal administrative agency's interpretation of a federal statute, and the federal statute is ambiguous, "the court does not simply impose its own construction on the statute," but must defer to the construction chosen by the agency, even if it is not the best interpretation. 467 U.S. at 842-43. But this deferential review — also known as *Chevron* deference — applies only to interpretations of federal law by federal administrative agencies. Significantly, none of the parties have cited to any authority for the proposition that state or territorial administrative agencies are entitled to *Chevron* deference. As one federal appellate court observed in a case involving the correctness of an interpretation of a Kentucky election statute,

> Appellees [the Kentucky Board of Elections and Kentucky Registry of Election Finance] assert that their interpretation of the statute is entitled to *Chevron* deference. Appellees, however, cite no case for the proposition that *Chevron* deference applies to *state* agency determinations. *Chevron* deference is predicated on the idea that legislative gaps serve as delegations from Congress to administrative agencies, whose determinations are given controlling weight . . . . In order to demonstrate that such deference is due to the Kentucky Registry of Election Finance, the agency must, at the very least, establish under Kentucky law that the legislature intends ambiguities or gaps to be treated as delegations to administrative agencies. The agency makes no attempt to do so, and accordingly any claim to *Chevron* deference must fail.

*Anderson v. Spear*, 356 F.3d 651, 669 (6th Cir. 2004) (emphasis in original). Numerous state courts have also expressly declined to adopt the *Chevron* standard, and apply the traditional plenary standard of review to agency interpretations of law. *See, e.g., Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, 322 P.3d 712, 717-18 (2014) ("On pure questions of law, we have not adopted a *Chevron*-like standard of administrative deference. In fact our caselaw has openly repudiated that approach." (citation omitted)); *Gold Creek Cellular of Montana Ltd. P'ship v. State*, 372 Mont. 71, 310 P.3d 533, 535 (2013) ("The issues on appeal concern a state agency's implementation of purely state law . . . . Thus, the District Court correctly declined to apply Chevron's standard for administrative deference in this case."); *In re Complaint of Rovas*, 482 Mich. 90, 754 N.W.2d 259, 271

(2008) ("This Court has never adopted *Chevron* for review of state administrative agencies' statutory interpretations, and we decline to adopt it now."); *Public Water Supply Co. v. DiPasquale*, 735 A.2d 378, 383 (Del. 1999) ("[The agency] argues that . . . we should adopt the standard approved by the United States Supreme Court for federal agencies under *Chevron*. . . . We expressly decline to adopt such a standard with respect to review of an agency's interpretation of statutory law and reaffirm our plenary standard of review."). And while not expressly repudiating *Chevron*, even this Court has held that, when reviewing a territorial administrative agency's decision, "we exercise plenary review over *any issue of law*." *Prosser v. Public Servs. Comm'n of the U.S.V.I.*, 56 V.I. 391, 401 (V.I. 2012) (citing *Williams-Jackson v. Pub. Emps. Relations Bd.*, 52 V.I. 445, 450 (V.I. 2009)) (emphasis added); *see also V.I. Pub. Servs. Comm'n v. V.I. Water & Power Auth.*, 49 V.I. 478, 483 (V.I. 2008) (applying plenary standard of review to resolve jurisdictional dispute between two Virgin Islands administrative agencies).

 We can find no reason to depart from any of these precedents and apply anything other than a plenary standard of review to this case.[17] First, we note that the legislature has, on numerous occasions, explicitly

---

[17] We acknowledge that the federal District Court of the Virgin Islands has, in the context of a decision by the Supervisor of Elections to disqualify a candidate from the general election ballot, extended both *Chevron* and *Skidmore* to the Virgin Islands. *Coffelt v. Fawkes*, Civ. No. 2014-025, 2014 U.S. Dist. LEXIS 91665, *11-12 (D.V.I. July 7, 2014) (unpublished), *rev'd on other grounds*, 765 F.3d 197 (3d Cir. 2014). The District Court, however, provided no reasoning for its decision, and simply extended *Chevron* and *Skidmore* to the Virgin Islands without acknowledging our *Prosser*, *Williams-Jackson*, or *V.I. Pub. Servs. Comm'n* decisions. *See Edwards v. HOVENSA, LLC*, 497 F.3d 355, 362 n.5, 49 V.I. 1133 (3d Cir. 2007) ("[T]he District Court, when exercising jurisdiction over cases requiring the application of Virgin Islands law, will be required to predict how the Supreme Court of the Virgin Islands would decide an issue of territorial law."); 48 U.S.C. § 1613 ("The relations between the courts established by the Constitution or laws of the United States and the courts established by local law . . . shall be governed by the laws of the United States pertaining to the relations between the courts of the United States . . . and the courts of the several States in such matters and proceedings."). Although the Third Circuit reversed that decision on the merits, it too implied, in dicta, that *Chevron* and *Skidmore* may nevertheless be applicable to the dispute, 765 F.3d at 201-02, and — like the District Court — did not explain why this federal doctrine should apply when a court reviews a decision of a local Virgin Islands administrative agency. As such, we decline to overturn our prior precedents on this basis. *Accord Friends of the Columbia Gorge, Inc. v. Columbia River Gorge Comm'n*, 346 Ore. 366, 213 P.3d 1164, 1173 (2009) ("[G]iven that *Chevron* is a mainstay in the federal courts, the fact that federal courts have applied *Chevron* deference to compact agencies' interpretations of federal statute[s] may simply have been reflexive . . . . [W]e are not inclined to follow the cited cases without conducting our own analysis of the question.").

226

required courts to apply a higher, more deferential standard to an agency's findings. *See, e.g.*, 3 V.I.C. § 530a(b) ("In a review by appeal under this section, all questions of fact determined by the PERB shall be conclusive, if supported by substantial evidence in the record considered as a whole."); 12 V.I.C. § 191(c) ("Upon appeal all findings of fact by the Commissioner shall be deemed final and conclusive unless it is shown that such findings were not supported by substantial evidence."); 24 V.I.C. § 306(e)(3) ("[I]n the absence of fraud, the findings of fact by the hearing examiner, if supported by substantial evidence regardless of statutory or common-law rules, shall be conclusive."). That the legislature, unlike other statutes, omitted from 18 V.I.C. § 412 any reference to heightened standards of review is impressive evidence that it intended for traditional standards of review to apply. *See Murray v. Utah Labor Comm'n*, 2013 UT 38, 308 P.3d 461, 468 (2013) ("[M]ost agency actions listed in [Utah's Administrative Procedures Act] do not imply a standard of review. Absent this implication, we conclude that the Legislature intended our traditional standards of review to apply.").

█ Moreover, the policy considerations that led the United States Supreme Court to order the lower federal courts to apply *Chevron* deference are not present in the Virgin Islands. "A key justification for *Chevron* deference to federal agencies is national uniformity." *Hughes Gen. Contractors*, 322 P.3d at 717-18. Although enforcement of a federal statute is often entrusted to a single federal agency with nationwide jurisdiction, the judicial power of the United States is largely decentralized into 94 federal district courts and 13 intermediate courts of appeals. Thus, absent *Chevron* deference, a federal agency may need to

---

Likewise, we note that the District Court, in an unpublished decision, cited this Court's decision in *St. Thomas-St. John Bd. of Elections v. Daniel*, 49 V.I. 322, 328 n.7 (V.I. 2007), for the proposition that the "Board of Elections is an administrative body, and judicial review of its actions is guided by principles of administrative review." *Clarke v. Ross*, 57 V.I. 737, 747 (D.V.I. 2012). But footnote 7 of our *Daniel* decision simply said that the Superior Court had initially dismissed the petitioner's lawsuit for failure to exhaust administrative remedies because the Joint Board of Elections had not resolved his attempted appeal of the certified election results due to a lack of quorum, without expressing any opinion as to whether that dismissal had been correct or incorrect. It is so fundamental as to not require citation that the mere fact that an appellate court, in a summary of a case's procedural history, mentions that the trial court took a certain action does not indicate that the appellate court agrees with that action.

implement the very same federal statute differently throughout the country, in the event the lower federal courts disagreed as to the statute's meaning. Therefore, the *Chevron* standard promotes "the avoidance of a patchwork of federal standards among the numerous federal circuit courts of appeal," thus allowing a federal agency to enforce a federal statute in the same way throughout the nation. *Id.* However, "[t]hat concern is not implicated in our [territorial] system," in which we have one Superior Court whose final judgments are appealable as of right to one Supreme Court "and thus no real prospect for a split of judicial authority." *Id.* at 718.

More importantly, under *Chevron*, "[a]n agency is free to change the meaning it attaches to ambiguous statutory language, and the new interpretation may still be accorded *Chevron* deference." *Southern Utah Wilderness Alliance v. Dabney*, 222 F.3d 819, 828 (10th Cir. 2000). As the United States Supreme Court itself stated in *Chevron*,

> The fact that the agency has from time to time changed its interpretation of the term "source" does not, as respondents argue, lead us to conclude that no deference should be accorded the agency's interpretation of the statute. An initial agency interpretation is not instantly carved in stone. On the contrary, the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.

467 U.S. at 863-64. Were this Court to agree with Fawkes that the phrase "crime involving moral turpitude" in 48 U.S.C. § 1572(b) is ambiguous and, pursuant to *Chevron*, affirm her decision to certify Hansen's candidacy because reasonable people could differ as to whether willful failure to file an income tax return is not a "crime involving moral turpitude," this Court would likewise be compelled — also under *Chevron* — to affirm the decision of a future Supervisor of Elections to refuse to certify Hansen's candidacy on the very same basis. Unquestionably, an issue as fundamental as who may qualify for membership in the Virgin Islands Legislature should not be subject to change based solely on the judgment of whoever happens to serve as the Supervisor of Elections at a given time. Accordingly, we apply a plenary review to the sole legal question before us — whether a

violation of 33 V.I.C. § 1524 is a "crime involving moral turpitude" — without granting any deference to Fawkes's determination.[18]

## B. Meaning of "Crime Involving Moral Turpitude"

The Superior Court, in its July 30, 2014 order, did not mention Chevron by name, but implicitly deferred to Fawkes's analysis. Essentially, the Superior Court held that, because the phrase "crime involving moral turpitude" has purportedly not been defined in either the Revised Organic Act or by the Legislature or the boards of elections,[19]

---

[18] Moreover, even if this Court were to adopt the deferential *Chevron* standard of review — which we expressly do not do — we would still not apply it to this case. The United States Supreme Court and numerous federal courts of appeal have emphasized that *Chevron* deference only applies to actual reasoned interpretations of statutes or regulations issued by the agency prior to the commencement of litigation, and does not extend to "*post hoc* rationalizations," such as arguments made for the first time by the agency's counsel in a brief filed with a court attempting to defend the agency's decision. *See, e.g.*, *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 156-58, 111 S. Ct. 1171, 113 L. Ed. 2d 117 (1991); *Price v. Stevedoring Servs. of America, Inc.*, 697 F.3d 820, 830 (9th Cir. 2012); *Miller v. Clinton*, 687 F.3d 1332, 1340-41, 402 U.S. App. D.C. 106 (D.C. Cir. 2012); *Motorola, Inc. v. United States*, 436 F.3d 1357, 1366 (Fed. Cir. 2006); *Matz v. Household Int'l Tax Reduction Inv. Plan*, 265 F.3d 572, 574-75 (7th Cir. 2001); *Ball v. Memphis Bar-B-Q Co., Inc.*, 228 F.3d 360, 365 (4th Cir. 2000).

In this case, Fawkes's May 14, 2014 letter rejecting Bryan's challenge to Hansen's candidacy simply states that she reviewed Hansen's nomination papers and concluded that she meets the qualifications to serve as a Senator, without providing any reasoning or explanation for that decision. As such, the legal arguments Fawkes's counsel has made on her behalf in her filings in the Superior Court and in her brief in this Court constitute the classic example of *post hoc* rationalizations that do not receive any deference even under *Chevron*. In fact, Fawkes's cursory statement that she "reviewed the [c]ase file and consulted with the U.S. Attorney" and "determined that [Hansen] meets the qualifications established by law for public office as a Senator" is so lacking in reasoning that we would not even afford it *Skidmore* deference. *See Miranda Alvarado v. Gonzales*, 449 F.3d 915, 917 (9th Cir. 2006) (affording no deference where the "conclusory decision in this case . . . does not adequately exhibit the requisite *Skidmore* factors").

[19] We question whether the Superior Court is correct to hold that the boards of elections have provided Fawkes with no guidance as to whether 33 V.I.C. § 1524 constitutes a "crime involving moral turpitude." In the Joint Appendix, the parties have provided this Court with a document bearing "Election System of the Virgin Islands" letterhead, which is titled "Categories of Crimes Involving Moral Turpitude" and explicitly identifies "Tax evasion (willful)" and "Pattern of failure to file federal tax returns in years in which taxes are due" as examples of "[c]rimes involving moral turpitude." (J.A. 128.) Notably, neither Fawkes nor Hansen, in their respective appellate briefs, dispute Bryan's contention that this document had been duly adopted by the St. Croix Board of Elections pursuant to its rulemaking authority. *See* 18 V.I.C. § 47(5) ("The boards of elections, within their respective election dis-

and that the definitions of "moral turpitude" found in the 2009 edition of Black's Law Dictionary and other authorities "tend to be vague and amorphous," that it would not overturn Fawkes's decision to certify Hansen in the absence of "binding or strongly persuasive legal precedent" establishing that a "conviction under 33 V.I.C. § 1524 constitutes conviction of a crime of moral turpitude." (J.A. 6-7.) Nevertheless, because this Court, on appeal, applies the same standard — plenary — that the Superior Court should have applied, we may, in the interests of judicial economy, apply the correct standard of review in the first instance on appeal. *Gardiner v. Diaz*, 58 V.I. 199, 204 (V.I. 2013).

 As the Superior Court correctly noted, the phrase "crime involving moral turpitude" appears in section 6(b) of the Revised Organic Act, a federal statute adopted by Congress. Thus, while the boards of elections may possess the power to establish rules or instructions for the purpose of advising the Supervisor of Elections and other elections officials, neither the Legislature nor the boards of elections possess the authority to enact a statute or rule that conclusively defines the phrase "crime involving moral turpitude" for purposes of section 6(b).[20] *See Limtiaco v. Camacho*, 549 U.S. 483, 489 n.2, 127 S. Ct. 1413, 167 L. Ed. 2d 212 (2007) ("The Guam Legislature passed a law attempting to define the term 'tax valuation.' But that term appears in Guam's Organic Act, which is a federal statute. . . . Guam's territorial legislature cannot redefine terms used in a federal statute."); *accord Tobal v. People*, 51 V.I. 147, 151-52 (V.I. 2009). Rather, the appropriate inquiry is to apply the rules of statutory construction to determine what Congress intended at the time it

---

tricts, have . . . the duty to: . . . make and issue such rules, regulations and instructions, not inconsistent with law, as it may deem necessary for the guidance of election officers and other assistants, and electors."). In any case, as we discuss below, whether or not the St. Croix Board of Elections promulgated such a definition is not relevant, given that this Court applies a plenary standard of review without affording deference to either the Supervisor of Elections or the Board of Elections.

[20] Hansen asserts that the lack of a precise definition of moral turpitude "raises concerns about Hansen's due-process right to proper notice regarding the consequences of her conduct." (Hansen Br. 25 n.8.) But this was not raised before the Superior Court, and it is raised on appeal in a perfunctory manner, rendering the issue waived. V.I.S.CT.R. 4(h), 22(m). Further, the United States Supreme Court explicitly rejected the contention that the term "moral turpitude" as used in another federal statute is void for vagueness. *Jordan v. De George*, 341 U.S. 223, 230-32, 71 S. Ct. 703, 95 L. Ed. 886 (1951).

enacted this provision.[21] *Limtiaco*, 549 U.S. at 490; *Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 758, 99 S. Ct. 2066, 60 L. Ed. 2d 609 (1979) (quoting *Teamsters v. United States*, 431 U.S. 324, 354 n.39, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977)).

While legislative history often serves as a useful tool for determining the meaning of ambiguous, undefined language, the legislative history of the Revised Organic Act — as well as the earlier Organic Act of 1936, where the phrase first appeared — contains no explanation of what Congress understood a "crime involving moral turpitude" to be. S. Rep. No. 83-1271, *reprinted in* 1954 U.S.C.C.A.N. 2585 (explaining only that the "bill would change the qualifications of legislators by providing . . . a person convicted of a felony or of a crime involving moral turpitude is eligible for membership if he has received a pardon restoring his civil rights"); Conf. Rep. No. 83-2105, *reprinted in* 1954 U.S.C.C.A.N. 2619 (making no mention of moral turpitude). Nevertheless, the absence of any relevant legislative history does not leave us without interpretative tools. As this Court has previously explained, when Congress includes undefined language in the Revised Organic Act that it borrows from or previously used in another federal statute, it is deemed to be "aware of how that same language had been interpreted by the United States Supreme Court" and to have "intended to reach the same result with respect to the Virgin Islands." *Ward v. People*, 58 V.I. 277, 283-84 (V.I. 2013), *cert. denied*, 134 S. Ct. 516, 187 L. Ed. 2d 372 (2013) (citing 2B NORMAN J. SINGER, SUTHERLAND STATUTORY CONSTRUCTION § 52.2 (7th ed. 2008)). Therefore, rather than relying solely on the 2009 edition of Black's Law Dictionary and similar modern authorities, the rules of statutory construction compel that we determine if the phrase "crimes involving moral turpitude" was used in any federal

---

[21] In his appellate brief, Bryan emphasizes that this Court, in various bar admission and attorney discipline cases, has adopted and applied its own definition of the phrase "moral turpitude," which he asserts should be applied to this case. *See, e.g.*, *In re Shea*, 59 V.I. 552, 559 (V.I. 2013); *In re Coggin*, 49 V.I. 432, 437 (V.I. 2008). However, we decline to apply these precedents as binding authority in this case because our goal is to ascertain how Congress intended for that phrase to apply in 1954, and these decisions — rendered in the context of this Court exercising its inherent power to regulate the practice of law in the Virgin Islands — did not attempt to answer that question.

231

statute prior to adoption of the Revised Organic Act, and, if so, ascertain how that phrase was defined by the United States Supreme Court.[22]

■■■ Since the Revised Organic Act serves as the *de facto* constitution for the Virgin Islands, *Todmann v. People*, 57 V.I. 540, 546 (V.I. 2012) (quoting *Brow v. Farrelly*, 994 F.2d 1027, 1032, 28 V.I. 345 (3d Cir. 1993)), we begin by considering other organic acts adopted by Congress. In the Guam Organic Act of 1950, Congress similarly provided that "[n]o person shall sit in the legislature . . . who has been convicted of a felony or of a crime involving moral turpitude and has not received a pardon restoring his civil rights." 48 U.S.C. § 1423f. That provision, however, has never been interpreted by any court, even to this day. And while similar provisions appeared in a number of state constitutions before Congress adopted the Revised Organic Act, *see, e.g.*, *Maben v. Rosser*, 24 Okla. 588, 103 P. 674, 675 (1909); *State v. Brown*, 105 Ohio St. 479, 138 N.E. 230, 233 (1922), of which Congress may be deemed to have been aware, *see Browne v. People*, 50 V.I. 241, 259-63 (V.I. 2008) (looking to similar state constitutional provisions to interpret the Revised Organic Act), even these provisions do not appear to have been the subject of judicial review, either before or after 1954.

Despite this, the phrase "moral turpitude" does have deep roots in the law. "The term 'moral turpitude' first appeared in a federal immigration statute in 1891." *Da Silva Neto v. Holder*, 680 F.3d 25, 28 (1st Cir. 2012). That statute mandated the exclusion from the United States of non-citizens "who have been convicted of a felony or other infamous crime or misdemeanor involving moral turpitude." Law of March 3, 1891, ch. 550, 26 Stat. 1084; *see also* Nate Carter, Comment, *Shocking the Conscience of Mankind: Using International Law to Define "Crimes Involving Moral Turpitude" in Immigration Law*, 10 Lewis & Clark L. Rev. 955, 957 (2006). Congress, however, did not define the phrase "infamous crime or misdemeanor involving moral turpitude." Subsequently, the Immigration Act of 1917 amended this language to authorize deportation of non-citizens twice convicted of a "crime involving moral turpitude," a phrase

---

[22] Given that the appropriate inquiry is ascertaining the intent of Congress when it enacted section 6(b) in 1954, we agree with Fawkes and Hansen that the rule established in *Banks v. Int'l Rental & Leasing Corp.*, 55 V.I. 967 (V.I. 2011), is not implicated in this matter, and therefore reject Bryan's claim that the Superior Court committed error by failing to conduct a *Banks* analysis to determine the meaning of "crime involving moral turpitude."

which Congress again did not define. Pub. L. No. 64-301, 39 Stat. 874. However, "[t]he legislative history leaves no doubt . . . that Congress left the term 'crime involving moral turpitude' to future administrative and judicial interpretation."[23] *Cabral v. I.N.S.*, 15 F.3d 193, 195 (1st Cir. 1994) (citing House Committee on Immigration and Naturalization Hearings on H.R. Rep. No. 10384, 64th Cong., 1st Sess. at 8 (1916)).

■ The Supreme Court of the United States extensively analyzed the meaning of the phrase "crime involving moral turpitude" in a case decided three years before Congress passed the Revised Organic Act. There, the Supreme Court held that "[w]ithout exception, federal and state courts have held that a crime in which fraud is an ingredient involves moral turpitude." *Jordan v. De George*, 341 U.S. 223, 227, 71 S. Ct. 703, 95 L. Ed. 886 (1951). Specifically, it observed that

> [i]n every deportation case where fraud has been proved, federal courts have held that the crime in issue involved moral turpitude. This has been true in a variety of situations involving fraudulent conduct: obtaining goods under fraudulent pretenses, conspiracy to defraud by deceit and falsehood, forgery with intent to defraud, using the mails to defraud, execution of chattel mortgage with intent to defraud, concealing assets in bankruptcy, issuing checks with intent to defraud. In the state courts, crimes involving fraud have universally been held to involve moral turpitude.

*Id.* at 227-28 & n.13 (citations omitted). Thus, no matter what other crimes may also involve moral turpitude,[24] because we assume that Congress was aware of the Supreme Court's ruling in *Jordan* when it enacted the Revised Organic Act, we must conclude that Congress, at the very least, intended the

---

[23] The fact that Congress deliberately left the phrase "crime involving moral turpitude" undefined in the 1917 Immigration Act so that the meaning of the phrase may be determined by immigration authorities and the courts provides further support for the fact that Congress, by including this same phrase in section 6(b) of the Revised Organic Act, intended for the meaning of the phrase to be determined by the boards of elections and Virgin Islands courts.

[24] We note that post-1954 federal case law has further expanded the definition of "crime involving moral turpitude," for it "has [been] frequently held that 'evil intent' is a touchstone of determining whether a crime is one of moral turpitude." *Andrade-Valle v. Holder*, 574 Fed. Appx. 836, 840 (10th Cir. 2014) (quoting *Partyka v. Att'y Gen.*, 417 F.3d 408, 413 (3d Cir. 2005)).

phrase "crime of moral turpitude" to encompass all crimes "in which fraud is an ingredient."

With this definition of "crime involving moral turpitude" in mind, we now turn to Hansen's convictions. The record reflects that Hansen was convicted of three counts of violating 33 V.I.C. § 1524, a statute which reads, in its entirety, as follows:

> Whoever, being required by the internal revenue laws of the Virgin Islands to pay any tax, or required by this subtitle or the regulations issued under authority thereof, or by the Virgin Islands income tax law or the regulations issued under authority thereof, to make a return, keep any records, or supply any information, willfully fails to pay such tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be fined not more than $10,000 or imprisoned not more than 1 year, or both, together with the costs of prosecution.

Notably, section 1524 does not specifically reference fraud. Likewise, the pertinent counts of the Third Superseding Indictment, upon which Hansen was tried, stated that Hansen had received gross income in the amount of $65,000, $36,744, and $34,630 for the 2002, 2003, and 2004 tax years, that she was "well-knowing" of the fact that she was "required by law" to file an income tax return, and that she "did willfully fail to make an income tax return . . . reporting her gross income, deductions and credits, as required by law," but also make no mention of fraud.

 But "[e]ven if intent to defraud is not explicit in the statutory definition, a crime nevertheless may involve moral turpitude if such intent is implicit in the nature of the crime." *Carty v. Ashcroft*, 395 F.3d 1081, 1083 (9th Cir. 2005). Although there are few published opinions dealing with section 1524, it was one of the original provisions of the Virgin Islands Code adopted in 1957, which was modeled after 26 U.S.C. § 7203.[25] *Gov't of the V.I. v. Allen*, 251 F. Supp. 479, 480, 5 V.I. 338 (D.V.I. 1966) ("Section 1524 of Title 33 of the Virgin Islands Code is

---

[25] Section 7203, previously codified as 26 U.S.C. § 145(a), provides, in pertinent part, that

> Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make

principally taken from the Federal Internal Revenue Code § 7203."). And "[w]hen the Legislature borrows a statute from another jurisdiction, the local enactment is construed to mean what the highest court of that jurisdiction construed it to mean before the Legislature adopted it." *Brunn v. Dowdye*, 59 V.I. 899, 909 (V.I. 2013). Therefore, the United States Supreme Court's pre-1957 interpretation of the federal statute would control our interpretation of the local enactment, while post-1957 Supreme Court cases — and cases from other federal courts both before and after 1957 — constitute persuasive authority. *Id.*; *see also In re Estate of Small*, 57 V.I. 416, 428 n.5 (V.I. 2012); *H & H Avionics, Inc. v. V.I. Port Auth.*, 52 V.I. 458, 461 (V.I. 2009).

■ Willful failure to file a tax return is a misdemeanor under both federal and local law, whereas tax evasion is a felony. Tax evasion is defined under both 33 V.I.C. § 1521 and 26 U.S.C. § 7201 as "willfully attempt[ing] in any manner to evade or defeat any tax."[26] While no federal court appears to have analyzed whether a conviction for willful failure to file a tax return in violation of 26 U.S.C. § 7203 or its predecessor statute constitutes a "crime involving moral turpitude,"[27] courts have consistently held that felony tax evasion under 26 U.S.C. § 7201 is a crime of moral turpitude. However, courts have not based that determination on a finding that the act of tax evasion is inherently fraudulent; rather, they arrived at this conclusion by analyzing the

---

such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year, or both, together with the costs of prosecution.

[26] *Compare* 33 V.I.C. § 1521 ("Whoever willfully attempts in any manner to evade or defeat any tax imposed by this subtitle or the Virgin Islands income tax law or the payment thereof shall, in addition to other penalties provided by law, be fined not more than $10,000 or imprisoned not more than 5 years, or both, together with the costs of prosecution."), *with* 26 U.S.C. § 7201 ("Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.").

[27] We note, however, that at least one federal appellate court has affirmed a holding of the Board of Immigration Appeals that willfully failing to file a Missouri sales tax return qualifies as a "crime involving moral turpitude." *Chak Yiu Lui v. Holder*, 600 F.3d 980, 984 (8th Cir. 2010).

"willful" mental state, concluding that "[f]raud is so inextricably woven into the term willfully, as it is employed in [section 7201], that it is clearly an ingredient of the offense proscribed by that section," and that "[o]nly by creating unwarranted semantic distinctions could a contrary conclusion be reached." *Carty*, 395 F.3d at 1085 (quoting *Tseung Chu v. Cornell*, 247 F.2d 929, 933 (9th Cir. 1957)); *see also Gray v. Comm'r of Internal Revenue*, 708 F.2d 243, 246 (6th Cir. 1983) (conviction for tax evasion under 26 U.S.C. § 7201 "conclusively establishes fraud in a subsequent civil tax fraud proceeding"); *Klein v. Comm'r of Internal Revenue*, 880 F.2d 260, 262 (10th Cir. 1989) (a conviction under section 7201 "collaterally estops a taxpayer from denying fraud [in a] civil tax case involving the same years"); *Tomlinson v. Lefkowitz*, 334 F.2d 262, 265 (5th Cir. 1964) ("We conclude that the term willfully, as used in section [7201], must necessarily include the elements of fraud."); *Moore v. United States*, 360 F.2d 353, 356 (4th Cir. 1966) ("[W]hile the criminal evasion statute does not explicitly require a finding of fraud, the case-by-case process of construction of the civil [fraud] and criminal tax provisions has demonstrated that their constituent elements are identical.").

■ Most critically for this case, the United States Supreme Court unequivocally established — before the legislature borrowed language from 26 U.S.C. §§ 7201 and 7203 to codify 33 V.I.C. §§ 1521 and 1524 in 1957 — that the "willfulness" required to violate section 7201 is the same as that required to violate section 7203, with the only difference between the elements of these crimes being that the misdemeanor requires a willful failure to act in order to sustain a conviction, while the felony requires a willful action. *Spies v. United States*, 317 U.S. 492, 498-99, 63 S. Ct. 364, 87 L. Ed. 418, 1943 C.B. 1038 (1943) ("The difference between the two offenses, it seems to us, is found in the affirmative action implied from the term 'attempt,' as used in the felony subsection."); *see also Sansone v. United States*, 380 U.S. 343, 352, 85 S. Ct. 1004, 13 L. Ed. 2d 882 (1965) ("The only issue at trial was whether petitioner's act was willful. . . . [I]f petitioner's act was [w]illful . . . he was guilty of violating both §§ 7201 and 7203. If his act was not willful, he was not guilty of violating either § 7201 or § 7203. Thus on the facts of this case, §§ 7201 and 7203 'covered precisely the same ground.' " (quoting *Berra v. United States*, 351 U.S. 131, 134, 76 S. Ct. 685, 100 L. Ed. 1013, 1956-1 C.B. 644 (1956))); *United States v. Bishop*, 412 U.S. 346, 356, 93 S. Ct. 2008, 36 L. Ed. 2d 941 (1973) ("The clear implication of the

decision in *Sansone* is that the word 'willfully' possesses the same meaning in §§ 7201, 7203."); *United States v. Vitiello*, 363 F.2d 240, 242 (3d Cir. 1966) ("this distinction is found in the additional misconduct which is essential to the violation of the felony statute, . . . and not in the quality of willfulness which characterizes the wrongdoing"). This interpretation is consistent with the single reported case specifically addressing the willfulness requirement of 33 V.I.C. § 1524, in which the District Court of the Virgin Islands concluded in that the willfulness necessary for a conviction under section 1524 "require[d] existence of a specific wrongful intent — an evil motive — at the time the crime charged was committed." *Allen*, 251 F. Supp. at 479-80 (quoting *United States v. Palermo*, 259 F.2d 872, 882 (3d Cir. 1958)); *see also United States v. Murdock*, 290 U.S. 389, 394, 54 S. Ct. 223, 78 L. Ed. 381, 1934-1 C.B. 144, 1934-1 C.B. 145 (1933) ("The word ["willful"] . . . when used in a criminal statute, . . . generally means an act done with a bad purpose."); *Spies*, 317 U.S. at 498 ("We would expect willfulness in such a case to include some element of evil motive and want of justification in view of all the financial circumstances of the taxpayer."); *Bishop*, 412 U.S. at 361 ("The Court's consistent interpretation of the word 'willfully' to require an element of mens rea implements the pervasive intent of Congress to construct penalties that separate the purposeful tax violator from the well-meaning, but easily confused, mass of taxpayers.").

 Because fraud is "inextricably woven into the term willfully" as used in section 1524,[28] we conclude that Hansen was convicted of "crime[s] involving moral turpitude."[29] Accordingly, we reverse the

---

[28] As explained above, although we reach our decision by following the definition of "crime involving moral turpitude" adopted by the United States Supreme Court in *Jordan* — a case that predates Congress's adoption of the Revised Organic Act for the Virgin Islands — more recent federal case law has held that crimes committed with an "evil intent" fall within the definition of a "crime involving moral turpitude." *See, e.g.*, *Andrade-Valle*, 574 Fed. Appx. at 840; *Partyka*, 417 F.3d at 413. Were we to apply these more recent precedents — which we need not do, in light of our holding that a conviction for violating 33 V.I.C. § 1524 inherently requires fraud — we would not hesitate to conclude that Hansen's convictions were for "crime[s] involving moral turpitude," given the United States Supreme Court's clear and unquestionable holdings that the term "willfully," as it is used in section 7203, means "evil intent" or "evil motive and want of justification in view of all the financial circumstances of the taxpayer." *Bishop*, 412 U.S. at 360; *Murdock*, 290 U.S. at 398; *Spies*, 317 U.S. at 498.

[29] Although not determinative to our analysis, we also cannot ignore that numerous state courts have, in the context of professional disciplinary proceedings, held that a conviction for

Superior Court's July 30, 2014 order, and direct it to, on remand, grant Bryan's petition and set aside Fawkes's decision to place Hansen on the

---

willful failure to file a tax return in violation of section 7203 or its predecessor, section 145(a), constitute per se crimes of moral turpitude. *See, e.g., In re McKechnie*, 214 Ore. 531, 330 P.2d 727, 728 (1958) ("The intentional violation of an Act [section 7203] designed to carry out the purposes of government itself, whether done with corrupt intent or not, conflicts with the moral duty of a citizen."); *State ex rel. Nebraska Bar Ass'n v. Fitzgerald*, 165 Neb. 212, 85 N.W.2d 323, 326-27 (1957) ("[R]espondent was called by those in charge of the Internal Revenue Service to explain his failure to file income tax reports as required by section 145(a) of the Internal Revenue Code of 1939 and section 7203, Internal Revenue Code of 1954 . . . . [I]t is clear that to knowingly and willfully fail to make income tax reports, as required by federal statutes, involves moral turpitude."); *In re Burrus*, 364 Mo. 22, 258 S.W.2d 625, 625, 627 (1953) ("Section 145(a) of the Internal Revenue Code . . . makes it a misdemeanor . . . for any person required by law to make a Federal income tax return to willfully fail to make the same. . . . We think it quite clear . . . that his intentional failure to make returns as the law required constituted conduct involving moral turpitude."); *Rheb v. Bar Ass'n of Baltimore City*, 186 Md. 200, 46 A.2d 289, 289, 291 (1946) ("[T]he appellant plead guilty . . . to an indictment charging him with wilfully, knowingly and unlawfully failing to make income tax returns to the Federal Government for the years 1940, 1941 and 1942 . . . in violation of section 145(a) . . . . [T]he authorities support the proposition that a crime of this character, even though not a felony, involves moral turpitude.").

While Hansen correctly notes in her appellate brief that not all state courts have adopted this *per se* rule, *see, e.g., Committee on Legal Ethics of W. Va. State Bar v. Scherr*, 149 W. Va. 721, 143 S.E.2d 141, 145 (1965); *Kentucky State Bar Ass'n v. Brown*, 302 S.W.2d 834, 834 (Ky. 1957); *In re Hallinan*, 43 Cal. 2d 243, 272 P.2d 768 (1954), we note that many such decisions were rendered before the United States Supreme Court's decision in *Bishop*, during a period in which it appeared that a conviction under section 7203 might require a lower mens rea than a conviction under section 7201. For example, the *Scherr* decision emphasized that a conviction for violating section 7201 is a felony and "involve[s] moral turpitude" but that a conviction for violating section 7203 was merely a misdemeanor, implying that different mental states were required for each offenses. Notably, the courts that have considered the issue in light of the *Bishop* decision have emphasized the fact that the mental state for both offenses is the same. *See, e.g., In re Nicholson*, 243 Ga. 803, 257 S.E.2d 195, 197 (1979) (collecting cases). In fact, at least one jurisdiction — Ohio — has since overturned its pre-*Bishop* precedents holding that willful failure to pay income tax is now a *per se* crime involving moral turpitude. *Compare Cincinnati Bar Ass'n v. Leroux*, 16 Ohio St. 2d 10, 242 N.E.2d 347, 348 (1968) (holding conviction for willfully failing to file a return under section 7203 is not a crime involving moral turpitude because Congress considered the offense less serious than violation of section 7201), *with Maga v. Ohio State Med. Bd.*, No. 11AP-862, 2012 Ohio 1764, P26 (Ohio Ct. App. Apr. 12, 2012) (unpublished) ("Ohio has adopted a violation of 26 U.S.C. [§] 7203 to constitute conduct involving moral turpitude, at least with an attorney.") (citing *Office of Disciplinary Counsel v. Bowen*, 38 Ohio St. 3d 323, 528 N.E.2d 172 (1988)), *and Columbus Bar Ass'n v. Wolfe*, 70 Ohio St. 2d 55, 434 N.E.2d 1096, 1096 (1982) ("Since 1972, the rule in Ohio has been that an attorney who is convicted of the charge of willful failure to file income tax returns is indefinitely suspended from the practice of law.") (collecting cases).

238

general election ballot as a candidate for membership to the 31st Legislature.[30] *See* 18 V.I.C. § 412 ("If the court finds that the nomination petition or paper is defective . . . or was not filed by persons entitled to file it, it shall be set aside.").

## IV. CONCLUSION

Both the Superior Court and this Court unquestionably possess jurisdiction to adjudicate Bryan's challenge to Hansen's eligibility to serve in the 31st Legislature. Moreover, pursuant to binding United States Supreme Court precedent, Hansen's conviction for willful failure to file tax returns is a "crime involving moral turpitude" that renders her ineligible to serve in the 31st Legislature. Thus, we reverse the Superior Court's July 30, 2014 order, and direct the Superior Court to grant Bryan's petition and remove Hansen from the general election ballot.[31]

---

[30] In her appellate brief, Hansen argues that, because the Superior Court disposed of Bryan's petition by granting Fawkes's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the only remedy Bryan is entitled to is a remand for further proceedings, since Bryan never moved for judgment in his favor. However, Hansen ignores that "the Federal Rules of Civil Procedure . . . represent rules of last resort . . . and should be invoked only when a thorough review of applicable Virgin Islands statutes, Superior Court rules, and precedents from this Court reveals the absence of any other procedure." *Sweeney v. Ombres*, 60 V.I. 438, 442 (V.I. 2014). Section 412 of title 18 of the Virgin Islands Code mandated that the Superior Court hold a hearing on Bryan's petition within ten days, and to issue a ruling *on the petition* within fifteen days of that hearing. Applying the Federal Rules of Civil Procedure through Superior Court Rule 7 would clearly be inappropriate in a case such as this, when a Virgin Islands statute provides for an expedited procedure and sets forth with precision how those proceedings should occur. In fact, had the Superior Court followed the statutory procedure, it would have held a hearing on May 29, 2014, and issued a final decision based on Bryan's petition no later than June 13, 2014, well before Fawkes filed her July 1, 2014 motion to dismiss. Moreover, on appeal, this Court is authorized to "render judgment of affirmance, judgment of reversal and final judgment upon the right of any or all of the parties, or judgment of modification thereon according to law," 4 V.I.C. § 32(c), and thus, in a case such as this involving a pure question of law, may address the erroneous granting of a motion to dismiss by setting it aside and directing entry of judgment in favor of the party that should have prevailed. *See Ad Hoc Shrimp Trade Action Committee v. United States*, 618 F.3d 1316, 1321-22 (Fed. Cir. 2010); *Russell v. United States*, 551 F.3d 1174, 1182 (10th Cir. 2008).

[31] Given our holding that Hansen is not eligible to serve in the 31st Legislature, it is also likely that Hansen may not have been eligible to serve in the 29th Legislature or in the 30th Legislature. Nevertheless, because the power to certify Hansen's membership in the 30th Legislature has long since shifted from the boards of elections to the 30th Legislature, this Court lacks the authority to order her removal. *See Mapp*, 24 V.I. at 305.