IN THE SUPREME COURT
OF THE VIRGIN ISLANDS

**FILED**
March 22, 2024 01:57 PM
SCT-Civ-2023-0126
VERONICA HANDY, ESQUIRE
CLERK OF THE COURT

**For Publication**

# IN THE SUPREME COURT OF THE VIRGIN ISLANDS

| | |
|---|---|
| **STEVEN D. PAYNE and NOELLISE POWELL,**<br>Plaintiffs,<br><br>v.<br><br>**35th LEGISLATURE OF THE VIRGIN ISLANDS and SENATOR NOVELLE E. FRANCIS, JR.,**<br>Defendants. | **S. Ct. Civ. No. 2023-0126**<br>formerly Super. Ct. Civ. No. 247/2022 (STT) |

On Transferred Action from the Superior Court of the Virgin Islands

Argued: March 12, 2024
Filed: March 22, 2024

Cite as: 2024 VI 13

**BEFORE:**   **RHYS S. HODGE**, Chief Justice; **MARIA M. CABRET**, Associate Justice; and **IVE ARLINGTON SWAN**, Associate Justice.

**APPEARANCES:**

**Treston E. Moore, Esq.**
Moore Dodson Russell & Willhite, P.C.
St. Thomas, U.S.V.I.
    *Attorney for Plaintiffs,*

**Joseph B. Arellano, Esq.**
Arellano & Associates, LLC
St. Thomas, U.S.V.I.
    *Attorney for Defendants.*

## OPINION OF THE COURT

**HODGE, Chief Justice.**

¶ 1     The 35th Legislature of the Virgin Islands and its President, Senator Novelle E. Francis,

*Payne v. 35th Legislature*          2024 VI 13
S. Ct. Civ. No. 2023-0126
Opinion of the Court
Page 2 of 28

Jr. (collectively "the Legislature"),[1] move to dismiss, on several constitutional grounds, a lawsuit filed against them by Steven D. Payne—a former member of the 34th Legislature—and Noellise Powell, a Virgin Islands taxpayer (collectively "the plaintiffs"). Due to the importance of the issues raised in that motion, this Court granted the Legislature's petition to transfer the underlying action from the Superior Court to itself in accordance with title 4, section 32(d) of the Virgin Islands Code. *See In re 35th Legislature of the V.I.*, 2024 VI 6. For the reasons that follow, we grant the motion and dismiss the plaintiffs' lawsuit in its entirety.

## I. BACKGROUND

¶ 2     Because this matter comes before this Court on a motion to dismiss filed in a case arising from its original jurisdiction, this Court accepts, as true, all well-pleaded allegations in the plaintiffs' complaint. *See Grisar v. Am. Fed. of Teachers*, 73 V.I. 491, 495 (V.I. 2020). Payne had been initially elected to the 33rd Legislature in 2018 and later successfully reelected to the 34th Legislature in 2020 as the single senator "elected at large by the qualified electors of the Virgin Islands from the Virgin Islands as a whole." 2 V.I.C. § 102. Powell, a resident of St. John, asserts that she voted for Payne in both elections.

¶ 3     Nearly two months after his swearing-in as a member of the 34th Legislature, Payne drove a female employee—identified by the pseudonym "Jane Doe"—to the Kings Alley Hotel in St. Croix on February 28, 2022. Approximately two weeks later, Doe made a verbal sexual harassment complaint against Payne based on events that allegedly occurred that night, which the

---

[1] The plaintiffs initially filed their lawsuit against the 34th Legislature and its President, Senator Donna Frett-Gregory. Because the 35th Legislature succeeded the 34th Legislature while this matter had been pending, and Senator Frett-Gregory had only been sued in her official capacity as President, this Court granted the request of the Legislature to substitute the 35th Legislature and Senator Francis as parties in accordance with Rule 34(c)(1) of the Virgin Islands Rules of Appellate Procedure. *See In re 35th Legislature*, 2024 VI 6, ¶ 1 n.1.

Executive Director of the 34th Legislature referred to Donna Frett-Gregory, the President of the 34th Legislature. In a March 25, 2022 letter, Frett-Gregory advised Payne of the complaint, stated that she was initiating a confidential investigation, and directed him to cooperate with the investigation. On April 19, 2022, after receiving the investigative report, Frett-Gregory referred the matter to the Legislature's Committee on Ethical Conduct ("CEC") pursuant to Rule 810 of the Rules of the 34th Legislature because it appeared that Payne might have engaged in conduct that violated the Legislature's Code of Ethical Conduct.

¶ 4     The CEC held preliminary hearings on May 17, 2022, and June 6, 2022, where it respectively heard testimony from Payne and Doe. On June 9, 2022, the CEC unanimously issued a "Statement of Alleged Violations" that formally charged Payne with four violations of the Legislature's Code of Ethical Conduct as well as a fifth violation for breaching his sworn oath of office. Payne filed a written response to those charges and appeared at a disciplinary hearing before the CEC on July 6, 2022. The CEC issued a "Statement of Alleged Violations & Recommended Penalty" on July 8, 2022, where it sustained four of the five charges and recommended as a sanction that Payne receive a letter of reprimand as well as a 50-day suspension without pay.

¶ 5     On July 19, 2022, the five members of the CEC jointly sponsored Bill No. 34-0287, which as originally drafted would have simply adopted the CEC's findings and recommended sanction. However, when Bill No. 34-0287 was brought before the entire Legislature for a vote on July 20, 2022, seven senators offered an amendment to change the sanction from a 50-day suspension and reprimand to expulsion. When no senator—not even Payne—objected to the proposed amendment, the amendment was adopted without debate, and the amended Bill No. 34-0287 was put to a vote. Ultimately, the amended Bill No. 34-0287 passed by a vote of 14-1, with Payne casting the only vote in opposition. The Legislature expelled Payne in accordance with the amended Bill No. 34-

0287—which became Resolution No. 1891 after its passage—and on July 25, 2022, swore-in a new senator, Angel Bolques, to fill the vacancy caused by Payne's expulsion pursuant to the procedure set forth in title 2, section 111(b) of the Virgin Islands Code.

¶ 6     The plaintiffs filed a motion for a temporary restraining order and preliminary injunction against the Legislature in the Superior Court on July 25, 2022, seeking to enjoin the expulsion. The Superior Court denied the motion for a temporary restraining order in a July 27, 2022 order, as moot, on the basis that the Legislature had already sworn-in Bolques to replace Payne. The next day, on July 28, 2022, the plaintiffs filed a complaint which in addition to injunctive relief also requested a declaratory judgment and damages. On August 10, 2022, and September 30, 2022, the Legislature filed motions to dismiss the plaintiffs' complaint on numerous grounds, including (1) failure to join indispensable parties; (2) immunity under the speech or debate provision of section 6(d) of the Revised Organic Act of 1954; (3) that the matter is non-justiciable because section 6(g) of the Revised Organic Act provides that the Legislature "be the sole judge of the elections and qualifications of its members" and may exercise "all the authority and attributes, inherent in legislative assemblies"; (4) immunity from money damages pursuant to section 2(b) of the Revised Organic Act; and (5) waiver. The Superior Court, however, did not act on the motions. The Legislature then filed another motion to dismiss on January 7, 2023, asserting that the case had also become moot because the 35th Legislature had been sworn-in and the term to which Payne had been elected had expired.

¶ 7     The Superior Court ultimately held a hearing on the motions to dismiss on January 10, 2023, and took the motions under advisement. In an April 25, 2023 opinion, the Superior Court denied the Legislature's January 7, 2023 motion to dismiss after determining that the underlying legal issues were capable of repetition yet evading review. *See Payne v. Frett-Gregory*, 2023 VI

Super 15U. The Superior Court, however, took no action with respect to the earlier motions to dismiss. After allowing the matter to remain dormant for an additional seven months, the Superior Court then entered a November 17, 2023 order scheduling the matter for a bench trial on March 14, 2024, which stated that the pending motions to dismiss "will be denied and a memorandum opinion and order will be issued shortly."

¶ 8    On December 22, 2023, the Legislature filed a petition with this Court to transfer the case from the Superior Court pursuant to title 4, section 32(d) of the Virgin Islands Code. In its petition, the Legislature asserted, among other claims, that the Superior Court infringed on the separation of powers principes inherent in the Revised Organic Act and exceeded its authority by setting the matter for trial without adjudicating the immunity defenses that had been fully briefed for nearly a year and a half, in effect denying the Legislature the protection of that immunity. This Court granted the transfer petition in a January 17, 2024 order, finding that the ordinary judicial process had proved inadequate due to failure of the Superior Court to rule on the immunity claims while nevertheless issuing rulings on non-immunity claims and setting the matter for an imminent trial. *See In re 35th Legislature*, 2024 VI 6, ¶ 7. In its transfer order, this Court vacated the November 17, 2023 order setting the matter for trial and denying the motions to dismiss without explanation, and stayed all proceedings pending consideration of this Court of the following three defenses: (1) immunity pursuant to section 6(d) of the Revised Organic Act; (2) non-justiciability pursuant to section 6(g) of the Revised Organic Act; and (3) immunity pursuant to section 2(b) of the Revised Organic Act.

## II. DISCUSSION

### A.  Jurisdiction and Legal Standard

¶ 9    "The Supreme Court may transfer to itself any action or proceeding originated or pending

in another local court or administrative agency within the Territory upon a finding that such a transfer will promote the administration of justice." 4 V.I.C. § 32(d). The Superior Court possessed original jurisdiction over this matter, *see* 4 V.I.C. § 76(a), and this Court exercised its authority under section 32(d) to transfer it to itself. *See In re 35th Legislature*, 2024 VI 6, ¶ 7. Consequently, this Court has divested the Superior Court of its jurisdiction over this matter effective January 17, 2024, and now possesses original and exclusive jurisdiction over this case.[2]

¶ 10    When adjudicating a motion to dismiss under Rule 12 of the Virgin Islands Rules of Civil Procedure, a court must accept, as true, all well-pleaded allegations in the plaintiffs' complaint. *See Grisar*, 73 V.I. at 495. However, a plaintiff's "legal conclusions," "naked speculation that is couched in the form of factual allegations," and similar assertions do not receive "the assumption of truth." *In re McLaughlin*, 60 V.I. 228, 237 (V.I. 2013) (quoting *Joseph v. Bureau of Corrections*, 54 V.I. 644, 649-50 (V.I. 2011)).

### B. The Constitutional Defenses

¶ 11    The Legislature asserts that three separate provisions of the Revised Organic Act of 1954 bar the plaintiffs' lawsuit. "[T]he Revised Organic Act serves as the *de facto* constitution for the Virgin Islands," *Bryan v. Fawkes*, 61 V.I. 201, 232 (V.I. 2014), and is interpreted by this Court in the same manner as the court of last resort of a state interprets its own state constitution. *See Balboni v. Ranger Am. of the V.I., Inc.,* 70 V.I. 1048, 1089-92 (V.I. 2019); *see also Puerto Rico v. Rubert Hermanos, Inc.*, 309 U.S. 543 (1940); Anthony M. Ciolli, *Territorial Constitutional Law*,

---

[2] On January 18, 2024, the Superior Court purported to issue an opinion providing its reasons for denying the Legislature's motion to dismiss in its earlier November 17, 2023 order. *See Payne v. Frett-Gregory*, 2024 VI Super 4. Because this Court already granted the Legislature's motion to transfer the case pursuant to section 32(d), the Superior Court was without authority or jurisdiction to issue the January 18, 2024 opinion and we consequently vacate it as a nullity with no legal effect.

58 IDAHO L. REV. 206, 240-47 (2022) (summarizing historical and contemporary interpretations of territorial organic acts and treatment as equivalents to state constitutions). We address each constitutional defense in turn.

## 1. Speech or Debate Clause Immunity

¶ 12    Section 6(d) of the Revised Organic Act, titled "Immunity of Members" and aptly referred to by the parties as its "Speech or Debate Clause," reads in its entirety as follows:

> No member of the legislature shall be held to answer before any tribunal other than the legislature for any speech or debate in the legislature and the members shall in all cases, except treason, felony, or breach of the peace, be privileged from arrest during their attendance at the sessions of the legislature and in going to and returning from the same.

48 U.S.C. § 1572(d). Relying primarily on a persuasive but non-binding Superior Court decision construing the clause, the Legislature asserts that this language renders "legislators . . . absolutely immune from judicial interference," conferring "a right not to stand trial" so that they may perform their functions "freely and without the fear of outside influence." *Lewis v. Legislature of the V.I.*, 44 V.I. 162, 165-66 (V.I. Super. Ct. 2002).

¶ 13    Certainly, the plain language of the Speech or Debate Clause confers extraordinarily broad immunity on "member[s] of the legislature" which parallels that conferred upon members of Congress under the United States Constitution and state legislators in the many states that codified similar protections in their state constitutions. *See* William M. Howard, *Construction and Application of Federal and State Constitutional and Statutory Speech or Debate Provisions*, 24 A.L.R.6th 255 (2007) (collecting constitutional provisions and cases). Importantly, courts have universally interpreted similar language in both the United States Constitution and these state constitutions to immunize legislators from lawsuits predicated not just on the content of statements made during speeches and debates made in the legislative chamber, but all activities integral to the

legislative process, including proposing and voting on bills.[3]   These expansive constitutional interpretations flow from both the original understanding of the phrase "speech or debate"  dating back to "the [English] Parliamentary struggles of the Sixteenth and Seventeenth Centuries," as well as the common law rules that developed in each state and territory prior to enactment of the relevant constitutional provisions that provided for robust civil immunity for legislators.  *See, e.g., Tenny v. Brandhove*, 341 U.S. 367, 372, 375 (1951); *State v. Beno*, 341 N.W.2d 668, 674-75 (Wisc. 1984).

¶ 14     Perhaps implicitly acknowledging the overwhelming authority in support of broad legislative immunity, the plaintiffs do not challenge the breadth of the Speech or Debate Clause of the Revised Organic Act.  Rather, the plaintiffs primarily contend that the Speech or Debate Clause is inapplicable to this dispute because they "have not sued any 'member' of the Legislature in any Member's 'individual capacity'" but "[r]ather, the 34th Legislature was sued as a branch of Government and its President was sued in her representative capacity."[4] (Plaintiffs' Br. 7-8.)

---

[3] *See, e.g., Eastland v. U.S. Servicemen's Fund,* 421 U.S. 491 (1975); *State v. Dankworth*, 672 P.2d 148 (Alaska Ct. App. 1983); *Romer v. Colorado Gen. Assembly*, 810 P.2d 215 (Colo. 1991); *Office of Governor v. Select Comm. of Inquiry*, 858 A.2d 709 (Conn. 2004); *Simpson v. Cenarrusa*, 944 P.2d 1372 (Idaho 1997); *State v. Neufeld,* 926 P.2d 1325 (Kan. 1996); *Kraus v. Kentucky State Senate*, 872 S.W.2d 433 (Ky. 1993); *Prelesnik v. Esquina*, 347 N.W.2d 226 (Mich. Ct. App. 1984); *Van Riper v. Tumulty*, 56 A.2d 611 (N.J. 1948); *Rivera v. Espada*, 777 N.E.2d 235 (N.Y. 2002); *Brock v. Thompson*, 948 P.2d 279 (Okla. 1997); *Consumers Educ. & Protective Ass'n v. Nolan*, 368 A.2d 675 (Pa. 1977); *Holmes v. Farmer*, 475 A.2d 976 (R.I. 1984).

[4] The plaintiffs also assert, in a cursory manner without any attempt to craft a legal argument, that "here the activity was not in conjunction with the speech or debate clause" and "[o]nly acts generally done in the course of the process of enacting legislation is covered by that language." (Plaintiffs' Br. 8.)  To the extent the plaintiffs imply that Payne's expulsion or the process that led to it—which included committee proceedings that culminated in the adoption and implementation of Resolution No. 1981—were somehow not legislative acts, the argument is patently frivolous. *See Massie v. Pelosi*, 72 F.4th 319, 322-23 (D.C. Cir. 2023) (holding that the adoption of internal rules, as well as passage and enforcement of a resolution implementing those rules, are all "legislative acts") (collecting cases).

¶ 15    As a threshold matter, the plaintiffs' claim that the President of the Legislature may not assert immunity under the Speech or Debate Clause for acts done in that official capacity is wholly without merit. That clause, by its own terms, provides that "[n]o member of the legislature shall be held to answer before any tribunal other than the legislature for any speech or debate in the legislature," 48 U.S.C. § 1572(d), without limiting that immunity only to instances where the member has been held to answer in an individual capacity. Significantly, it is difficult to envision any situation where a "member of the legislature" engaged in "any speech or debate in the legislature" yet did so in anything other than an official capacity. *See United States v. Brewster*, 408 U.S. 501, 511 (1972) ("In sum, the Speech or Debate Clause prohibits inquiry only into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts."). Consequently, we grant the motion to dismiss with respect to the Senate President based on the immunity conferred by the Speech or Debate Clause.

¶ 16    The plaintiffs' contention that the Speech or Debate Clause of the Revised Organic Act only immunizes individual legislators and not the Legislature as an institution possesses considerably more merit. The plain text of the clause certainly supports such a construction, in that it uses the phrase "member of the legislature" rather than a more inclusive phrase such as "the legislature and its members." That the drafters of the Revised Organic Act chose such a narrow phrase when they could easily have used obvious alternatives to clearly provide a broader construction constitutes impressive evidence that they intended to limit this immunity only to individual members. *See World Fresh Markets, LLC v. Palermo*, 74 V.I. 455, 465-66 (V.I. 2021). (holding that legislators presumably know the law when drafting legislation as well as the effect of choosing narrow language as opposed to broad language). Significantly, the Legislature cites to no legal authority to support its naked claim that "the body as a whole," and not just its members,

"is absolutely immune" under the Speech or Debate Clause. (Leg. Br. 18.) On the contrary, the few cases to consider this question have concluded that such immunity, while designed to improve the functioning of the legislative branch, is nevertheless personal to each member. *See, e.g., In re Grand Jury Investigation*, 587 F.2d 589, 593 (3d Cir. 1978) ("That privilege, although of great institutional interest to the House as a whole, is also personal to each member."); *United States v. American Tel. & Tel. Co.*, 567 F.2d 121, 130 (D.C. Cir. 1977) ("[T]he immunity from judicial inquiry afforded by the Speech or Debate Clause is personal to members of Congress. Where they are not harassed by personal suit against them, the clause cannot be invoked."); *United States v. Menendez*, 132 F.Supp.3d 610, 629 (D.N.J. 2015) ("[A]ny Speech or Debate privilege would be personal to Senator Harkin. Another Senator, such as Menendez, cannot shelter under Senator Harkin's privilege."). Thus, while we dismiss all claims against the Senate President, we deny the Legislature's claim to immunity pursuant to the Speech or Debate Clause.[5]

---

[5] In its reply brief, the Legislature cites to the decision of the Supreme Court of the United States in *Supreme Court of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719 (1980), where it held that the Supreme Court of Virginia was immune from liability under 42 U.S.C. § 1983 for promulgating the Virginia Code of Professional Responsibility because when it did so it acted in a legislative capacity. The United States Supreme Court, however, granted immunity to the Virginia Supreme Court as an institution due to <u>common-law</u> legislative immunity, and not because it qualified for immunity under the federal Speech or Debate Clause or any equivalent Virginia provision. 446 U.S. at 732-33. In this case, the Legislature has not asserted legislative immunity under the common law, but only pursuant to the Speech or Debate Clause of the Revised Organic Act, and in its transfer order this Court did not identify common-law legislative immunity as amongst the defenses it would consider at this stage of the proceeding. Moreover, the Legislature has raised the issue for the first time in its reply brief, thus depriving the plaintiffs of any opportunity to respond. *See Benjamin v. AIG Ins. Co. of P.R.*, 56 V.I. 558, 567 (V.I. 2012) ("When an argument is raised for the first time . . . in a reply brief, that argument is deemed waived because the appellee will not get an opportunity to respond to the argument."). Thus, while the Legislature as an institution could potentially qualify for common law legislative immunity pursuant to the *Supreme Court of Va.* decision, we decline to consider that defense at this late stage of briefing.

## 2. Sovereign Immunity[6]

¶ 17     The Legislature maintains that Payne's claim for money damages is barred by section 2(b) of the Revised Organic Act.  Section 2(b), which provides "[t]hat no tort action shall be brought against the government of the Virgin Islands or against any officer or employee thereof in his official capacity without the consent of the legislature constituted by this chapter," 48 U.S.C. § 1541(b), confers on the territorial government "a concept similar to the sovereign immunity afforded to the states."  *Magens Point Resort Hotel v. Benjamin*, 58 V.I. 191, 196 (V.I. 2009).

¶ 18     In their complaint, the plaintiffs allege that "Plaintiff Payne has been wrongfully denied his lawful compensation for his services as Senator" and that "Plaintiff Payne demands payment of those funds wrongfully withheld for immediate use in his Primary Campaign and thereafter." (J.A. 40.)   While the plaintiffs assert in their brief that "the failure of the Legislature to pay [Plaintiff] Payne's Senator Salary after he was expelled was in the nature of contract," Plaintiffs' Br. 12, they cite to no legal authority to support this proposition—nor could they, since the Supreme Court of the United States has long held that no contractual relationship exists between a public official and a government with respect to the salary for holding that office.  *See Dodge v. Board of Educ.,* 302 U.S. 74, 78-79 (1937); *Crenshaw v. United States*, 134 U.S. 99, 104-05 (1890); *see also Higginbotham v. City of Baton Rouge, La.*, 306 U.S. 535 (1939); *Legislature v. Eu*, 816 P.2d 1309, 1334 (Cal. 1991) (holding elected legislators possess no contractual rights to their salaries but do possess a contractual right to vested pension rights).  Thus, to obtain money

---

[6] Although identified as the third constitutional defense in our transfer order, we consider the Legislature's sovereign immunity claim before its non-justiciability defense because courts must "resolv[e] immunity questions at the earliest possible stage," *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), since immunity confers "an *immunity from suit* rather than a mere defense to liability" which "is effectively lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (emphasis in original).

damages for the loss of his legislative salary after his expulsion, any cause of action brought by Payne must necessarily arise in tort.

¶ 19    The plaintiffs further argue that even if Payne's claim sounds in tort, the Legislature waived its sovereign immunity by enacting the Virgin Islands Tort Claims Act ("VITCA"), 33 V.I.C. §§ 3401 et seq. However, this argument is misplaced because the waiver of sovereign immunity effected by the VITCA is not all-encompassing. First, the VITCA expressly "conditions this waiver on first satisfying certain notice, filing, and service requirements," *Alexander v. Wilson*, 73 V.I. 528, 534 (V.I. 2020), and the record in this case contains no indication that Payne did so.  But in any case, the VITCA provides that

> the Government of the United States Virgin Islands hereby waives its immunity from liability and action and hereby assumes liability with respect to injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of an employee of the Government of the United States Virgin Islands while acting within the scope of his office or employment, under circumstances where the Government of the United States Virgin Islands, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. The Government consents to have the liability determined in accordance with the same rule of law as applied to actions in the courts of the Virgin Islands against individuals or corporations[.]

33 V.I.C. § 3408 (emphases added).  This "private person" language is virtually word-for-word identical to similar language in the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1), and numerous state statutes waiving sovereign immunity. Courts interpreting such provisions have consistently held that it means what it says: if a private person can never be held liable for an act or omission—for instance, in a situation involving a uniquely governmental function that can never be performed by a private person—then the government's statutory waiver of sovereign immunity does not apply.  *See, e.g., McGowan v. United States,* 825 F.3d 118, 126 (2d Cir. 2016) ("Private persons cannot establish facilities to detain other persons—only the government can, either on its own or

through a governmental contractor. In short, there is no circumstance in state tort law that is analogous to the situation here."); *Green Acres Enterprises, Inc. v. United States*, 418 F.3d 852, 857 (8th Cir. 2005) ("Because the Corps alone has the authority to enforce the Clean Water Act and make permit decisions, no private analogue exists for the relevant conduct in this case. Thus, the FTCA's waiver of sovereign immunity does not apply.") (internal citations omitted); *McMann v. N. Pueblos Enters.*, 594 F.2d 784, 785–86 (10th Cir.1979) ("As the Miller Act deals exclusively with federal contracts, private persons would never be in a position to require the posting of a Miller Act bond by a contractor. It follows that private persons could not possibly be liable for any negligent failure to insist on the posting of such a bond. Since a private person could not be liable for such failure, the United States could not be [so held] under the provisions of the Federal Torts Claims Act."); *Doe v. State*, 980 N.W.2d 842, 859 (Neb. 2022) (holding Nebraska did not waive sovereign immunity from suit for wrongful disclosure of sealed criminal records since the plaintiff "failed to establish that a private person would owe him a legal duty under circumstances like those alleged in his complaint"). Obviously, a private person could never wrongfully expel a member of the Legislature from that body. Therefore, we dismiss Payne's claim for monetary damages on sovereign immunity grounds.

### 3. Non-Justiciability

¶ 20    Section 6(g) of the Revised Organic Act provides, in pertinent part, that "[t]he legislature shall be the sole judge of the elections and qualifications of its members." 48 U.S.C. § 1572(g). The Legislature asserts that this language renders the plaintiffs' lawsuit non-justiciable, vesting itself with the "exclusive jurisdiction to determine the elections and qualifications of its members" and purportedly creating a "carve-out from th[e] otherwise broad grant of judicial power" to the courts of the Virgin Islands. (Leg. Br. 19.)

¶ 21    The plaintiffs challenge both the proposition that this clause precludes any form of judicial review as well as the underlying premise that the Legislature expelled Payne for failing to satisfy the "qualifications" for holding office.  Relying heavily on the decision of the Supreme Court of the United States in *Powell v. McCormack*, 395 U.S. 486 (1969), interpreting similar language in the United States Constitution, the plaintiffs maintain that the only "qualifications" that the Legislature may judge pursuant to section 6(g) are the eligibility and ineligibility requirements set forth in section 6(b) of the Revised Organic Act, which reads, in its entirety, as follows:

> No person shall be eligible to be a member of the legislature who is not a citizen of the United States, who has not attained the age of twenty-one years, who is not a qualified voter in the Virgin Islands, who has not been a bona fide resident of the Virgin Islands for at least three years next preceding the date of his election, or who has been convicted of a felony or of a crime involving moral turpitude and has not received a pardon restoring his civil rights. Federal employees and persons employed in the legislative, executive or judicial branches of the government of the Virgin Islands shall not be eligible for membership in the legislature.

48 U.S.C. § 1572(b).  According to the plaintiffs, the provisions of section 6(b) are exclusive, and the Legislature lacks the authority to create additional "qualifications" for holding office—such as adherence to a code of conduct incorporated as part of its rules—or to enforce such "qualifications" through expulsion when the Revised Organic Act does not specifically vest it with an expulsion power.  The Legislature, however, counters by invoking the next clause of section 6(g), which provides that it "shall have and exercise all the authority and attributes, inherent in legislative assemblies, and shall have the power to institute and conduct investigations, issue subpoena to witnesses and other parties concerned, and administer oaths."  48 U.S.C. § 1572(g).

¶ 22    First, the Legislature is certainly incorrect in its assertion that section 6(g) serves as a complete "carve-out" that wholly divests, without exception, the courts of the Virgin Islands from exercising *any* role with respect to assessing the elections and qualifications of its members. This

Court has already interpreted section 6(g) to permit the courts of the Virgin Islands to determine whether a candidate for legislative office had been convicted of a crime involving moral turpitude that would constitutionally preclude her from serving if elected. *See Bryan*, 61 V.I. at 212-18. Likewise, this Court concluded that section 6(g) served as no bar to the courts of the Virgin Islands adjudicating whether a successful candidate for legislative office was a bona fide resident of the Virgin Islands for the requisite three-year period and even issuing an injunction barring that candidate from being administered the oath of office by the Legislature. *See Sarauw v. Fawkes*, 66 V.I. 253, 275 (V.I. 2017). And, in a non-binding yet persuasive opinion, the United States Court of Appeals for the Third Circuit seemingly limited the "sole judge" language of section 6(g) to only encompass factual determinations pertaining to the eligibility to hold office. *See Mapp v. Lawaetz*, 882 F.2d 49, 53-54 (3d Cir. 1989). These decisions are consistent with how the Supreme Court of the United States interpreted a similar clause of the United States Constitution in *Powell*, where it answered the question of whether the House of Representatives had the right to refuse to seat a member-elect because "determination of [the] right to sit would require no more than an interpretation of the Constitution" which "falls within the traditional role accorded courts to interpret the law, and does not involve a lack of the respect due a coordinate branch of government, nor does it involve an initial policy determination of a kind clearly for nonjudicial discretion." 395 U.S. at 548-49 (internal quotation marks and citations omitted). As such, the courts of the Virgin Islands certainly may adjudicate a lawsuit that implicates the eligibility of a person to serve as a legislator, at least with respect to interpreting the meaning of the pertinent language in the Revised Organic Act.

¶ 23    But while section 6(g) does not categorically prohibit the courts of the Virgin Islands from adjudicating <u>any</u> case involving the qualifications to hold legislative office, it does not necessarily

follow that <u>all</u> such cases are justiciable. This is because a matter is generally "nonjusticiable—i.e., involves a political question—where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.'" *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). Unlike this Court's *Bryan* and *Sarauw* precedents, this case does not involve a candidate or a member-elect whose section 6(b) qualifications were challenged in a court prior to the swearing-in of a new legislature, with no entity other than the Judicial Branch able to adjudicate the matter. Rather, the instant case involves a sitting member of the Legislature expelled by the Legislature pursuant to a procedure adopted by the Legislature more than a year after such member was sworn-in to that office for—at least as found by the Legislature—violating his oath of office and breaching the ethical rules promulgated by the Legislature.

¶ 24   To determine whether the plaintiffs' lawsuit is or is not justiciable, we must remain cognizant of the separation of powers principles explicitly or implicitly incorporated into the Revised Organic Act, *see Gerace v. Bentley*, 65 V.I. 289, 301 (V.I. 2016), and especially consider the impact of "judicial interference in the legislature's conduct of its own internal affairs." *Mapp*, 882 F.2d at 55. In performing this inquiry, we must first consider the plaintiffs' related contentions that the Revised Organic Act does not vest the Legislature with the authority to set additional qualifications for holding legislative office nor grants it the power to expel members. This is because if the Legislature exceeded its constitutional authority or otherwise acted *ultra vires*, the plaintiffs' lawsuit is necessarily justiciable since judicial involvement would vindicate rather than impair the separation of powers by limiting the Legislature to exercising only its constitutionally lawful authority.

*a. Legal Character of Ethics Code*

¶ 25      The plaintiffs assert that the Code of Ethical Conduct adopted by the 34th Legislature as part of the rules it adopted in its organizing session as Resolution No. 1880 constitute additional qualifications for membership in the Legislature.  As noted above, the plaintiffs maintain that the eligibility and ineligibility provisions found in section 6(b) of the Revised Organic Act constitute the exclusive qualifications for holding legislative office, and that the Legislature consequently lacks the constitutional authority to either create or enforce such additional qualifications.

¶ 26      In making this argument, the plaintiffs rely heavily on the United States Supreme Court's *Powell* decision.  In *Powell*, the United States Supreme Court held that the newly constituted House of Representatives could not refuse to administer the oath of office to a member-elect who had been under investigation for financial improprieties because doing so effectively imposed a new qualification for House membership besides those set forth in the House Qualifications Clause of the United States Constitution.[7] 395 U.S. at 550.  Moreover, many—and perhaps all—of the state courts called upon to interpret similar provisions in their state constitutions likewise arrived at this same result.[8]  As the Supreme Court of Colorado aptly explained,

---

[7] *See* U.S. CONST. art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State in which he shall be chosen.").

[8] *See, e.g., Reale v. Bd. of Real Estate Appraisers*, 880 P.2d 1205 (Colo. 1994); *State v. Welch*, 259 P.2d 112 (Or. 1953); *Whitney v. Bolin*, 330 P.2d 1003 (Ariz. 1958); *Thomas v. State*, 58 So.2d 173 (Fla. 1952); *People v. McCormick*, 103 N.E. 1053 (Ill. 1913); *State ex rel. Palagi v. Regan*, 126 P.2d 818 (Mont. 1942); *Gibbany v. Ford*, 225 P. 577 (N.M. 1924); *Cornell v. McAlister*, 249 P. 959 (Okla. 1926); *State v. Betensen*, 378 P.2d 669 (Utah 1963); *Buckingham v. State ex rel. Killoran*, 35 A.2d 903 (Del. 1944); *McCool v. State*, 115 So. 121 (Miss. 1928); *Lindner v. Dupont*, 4 N.W.2d 807 (S.D. 1942); *Mississippi County v. Green*, 138 S.W.2d 377 (Ark. 1940).  *See also* 63A Am.Jur.2d, *Public Officers and Employees* § 37 (1984) ("The general rule is that where the Constitution establishes specific eligibility requirements for a particular constitutional office, the constitutional criteria are exclusive.") (collecting cases).

this rule is grounded, ultimately, on unassailable principles of democratic governance. If the qualifications set out in [the Colorado Constitution] for the office of county assessor can only be read as establishing a minimum requirement, and not as a limitation on the imposition of additional qualifications by the General Assembly then there can be no doubt that the General Assembly would have the power to add qualifications for other constitutional offices. For example, the legislature could require that a governor obtain a degree in government by completing a prescribed course in an accredited university within one year after taking office, or that a justice take courses in jurisprudence for certification within a certain time frame. The legislature could also make obtaining a certificate by completing a minimum number of hours of classroom instruction and passing a standardized legislator's examination within six months after taking office a requisite for representatives and senators.

     As such, the most fundamental right reserved to the people—the right to vote for representatives of their choice—would hinge not on constitutional guarantees, but on the General Assembly's willingness to abstain from imposing additional qualifications for holding constitutional offices.

. . . .

     In a constitutional democracy the principle that the people must be permitted to vote for candidates of their choosing and in conformity with constitutional mandates is beyond question. Indeed, this principle is one of the primary features which distinguishes a constitutional democracy from other forms of government. That the right of the people to choose their representatives could hinge not on constitutional guarantees but on the predilections of the legislature, no matter how well-intentioned, is contrary to this elemental postulate of democratic government.

*Reale v. Bd. of Real Estate Appraisers*, 880 P.2d 1205, 1207-08 (Colo. 1994).

¶ 27    At first glance, *Powell* and these state supreme court decisions may appear to provide substantial support for the plaintiffs' construction of the Revised Organic Act. However, the plaintiffs fail to appreciate one critically important distinction: those cases all involve situations where a legislature attempted to impose additional requirements for eligibility to <u>obtain</u> an office, rather than for <u>continuing to occupy</u> an office after being duly sworn-in to office after election or appointment. "Whereas 'qualification' implies a precondition to attainment of an office, 'holding' connotes a *fait accompli*, an occupancy as a result of an appointment, promotion, or election."

*Moore v. Knightdale Bd. of Elections*, 413 S.E.2d 541, 547 (N.C. 1992) (internal citations omitted).

This distinction is not merely academic and has served as the basis for judicial decisions upholding the constitutionality of "resign-to-run" or "incompatible office" statutes that prohibit incumbent elected officials from simultaneously campaigning for or holding other elected offices. *See, e.g., Kane v. City of Albuquerque*, 358 P.3d 249 (N.M. 2015); *Riley v. Cordell*, 194 P.2d 857 (Okla. 1948); *Philyaw v. Gatson*, 466 S.E.2d 133 (W.Va. 1995); *Mulholland v. Ayers*, 99 P.2d 234 (Mont. 1940); *Holley v. Adams*, 238 So.2d 401 (Fla. 1970). In fact, this Court recently affirmed the constitutionality of a Virgin Islands resign-to-run statute, 18 V.I.C. § 2, for largely similar reasons: the statute did not preclude or restrict an elected member of the Board of Elections from seeking legislative office, but rather placed restrictions on the office she presently held to prevent potential conflicts-of-interest or abuse of power if a member of the Board of Elections were in a position to oversee her own election to the Legislature. *See Moses v. Fawkes*, 66 V.I. 454 (V.I. 2017).

¶ 28    Here, the 34th Legislature did not refuse to administer the oath of office to Payne because it determined that he violated its Code of Ethical Conduct. Had that been what occurred, the 34th Legislature would almost certainly have established an additional qualification for legislative office in contravention of section 6(b) of the Revised Organic Act. But that did not happen: the 34th Legislature swore-in Payne and every other member, and only sought to enforce its Code of Ethical Conduct approximately 14 months later when Doe made her sexual harassment complaint. Because the Legislature did not use compliance with its Code of Ethical Conduct to refuse to seat Payne or any other member-elect, it did not create an additional qualification for obtaining legislative office, but rather used it to regulate the conduct of a member who had already occupied such office.

*b. Expulsion Power*

¶ 29    That the Code of Ethical Conduct adopted by the 34th Legislature did not constitute an

additional qualification for obtaining legislative office does not resolve the justiciability question.

As noted earlier, the plaintiffs also assert that the Legislature lacks the constitutional authority to

expel a member and that it therefore acted *ultra vires* when it used expulsion to enforce compliance

with the Code of Ethical Conduct. The plaintiffs invoke two separate provisions of the Revised

Organic Act to support this argument: the absence of any specific reference to an expulsion power

in section 6(g) or anywhere else in the Revised Organic Act, and that section 12(c) of the Revised

Organic Act permits the legislature or the public to initiate a recall election to remove an elected

public official from office. According to the plaintiffs, these provisions, when read together,

evince an intent by the drafters of the Revised Organic Act to withhold the power of expulsion

from the Legislature and for recall elections to serve as the exclusive means to involuntarily

remove a legislator or other elected official from office before expiration of his or her term.

¶ 30    We disagree. Certainly, the Revised Organic Act does not include explicit language

expressly conferring an expulsion power on the Legislature. But it need not do so: in addition to

permitting the Legislature to judge the qualifications of its members, section 6(g) of the Revised

Organic Act provides that "[t]he legislature . . . shall have and exercise all the authority and

attributes, inherent in legislative assemblies." 48 U.S.C. § 1572(g). To determine what "authority

and attributes" the drafters of the Revised Organic Act considered "inherent in legislative

assemblies," we consider as highly persuasive authority a wide array of historical sources

including decisions of the Supreme Court of the United States and those of other state courts of

last resort, since this Court must presume that the drafters were aware of what powers such courts

deemed "inherent" when it chose to grant such broad, unenumerated authority to the Legislature

in lieu of specifically listing each and every one of its powers. *Bryan*, 61 V.I. at 231-32.

¶ 31    An examination of these sources reveals that the power to expel a member had been widely

understood as such an inherent power of a legislative body. The power of a legislative body to discipline its members—including expulsion—developed as "a corollary to immunity" dating back to "Parliament's struggles for independence" from the Crown in seventeenth-century England that "resulted in legislative privilege, which shielded Parliament from interference and liability from the King and the Judiciary." *Fifth Circuit Creates Circuit Split by Finding a Legislature's Censure Can Violate the First Amendment*, 134 HARV. L. REV. 2638, 2642 (2021) (citing Léon R. Yankwich, *The Immunity of Congressional Speech--Its Origin, Meaning and Scope*, 99 U. PA. L. REV. 960, 963-64 (1951)). "With immunity from external interference, internal discipline grew important [for Parliament] to operate effectively, and the traditional measures included. . . expulsion." *Id.* (citing THOMAS ERSKINE MAY, A TREATISE UPON THE LAW, PRIVILEGES, PROCEEDINGS AND USAGE OF PARLIAMENT 43, 49 (London, Charles Knight & Co. Ludgate-Street 1844)). The legislatures of the original thirteen American colonies modeled themselves after Parliament and "inherited legislative immunity" with "the power to discipline members . . . more or less assumed as part of legislative privilege" and considered "necessary to make all the other rules effective." *Id.* (quoting MARY PATTERSON CLARKE, PARLIAMENTARY PRIVILEGE IN THE AMERICAN COLONIES 184 (1943)) (internal quotation marks omitted). "Thus, Americans at the founding and after understood the power to punish members as a legislative power inherent even in the humblest assembly of men," with it serving as "the primary power by which legislative bodies preserve their institutional integrity without compromising the principle that citizens may choose their representatives." *Whitener v. McWatters*, 112 F.3d 740, 744 (4th Cir. 1997) (internal citations omitted) (collecting authorities).

¶ 32    This view of legislative discipline, including expulsion, persisted through the American Revolution and typically was not enumerated in a statute or other written code but "remained

common law" and had become so well-accepted by both legislatures and the courts that "[n]ear the Founding, the power was viewed as inherent to all public bodies, even the humblest assembly, as it kept rules from becoming nugatory." *Fifth Circuit,* 134 HARV. L. REV. at 2642 (quoting 2 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 835, at 298 (Boston, Hilliard, Gray & Co. 1833)) (internal quotation marks omitted). And the Supreme Court of the United States, as well as numerous state courts of last resort, continued to recognize this as an inherent authority of a legislative body after ratification of the United States Constitution. *See, e.g., Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 230 (1821); *Tyrell v. Common Council of Jersey City*, 25 N.J.L. 536, 539 (1856); *Hiss v. Bartlett*, 69 Mass. (3 Gray) 468, 475 (1855); *Mayor of Savannah v. Grayson*, 30 S.E. 693, 696 (Ga. 1898); *State ex rel. McMahon v. City Council of New Orleans*, 32 So. 22, 25 (La. 1902); *Hawkins v. Common Council*, 158 N.W. 953, 956 (Mich. 1916); *French v. Senate of State of Cal.*, 80 P. 1031 (Cal. 1905). In fact, it does not appear that <u>any</u> state court of last resort has ever held that a state legislature lacks the authority to ever discipline or expel a member under any circumstances.

¶ 33     That section 12(c) of the Revised Organic Act also permits the recall of elected public officials does not diminish or negate the authority of the Legislature to expel a member. The right of voters to remove elected officials, although having been proposed and debated in the late 18th century, is still a relatively new power only actually implemented at the state and local level in the early 20th century. *See Committee to Recall Robert Menendez v. Wells,* 7 A.3d 720, 745, 748-49 (N.J. 2010) (holding that the right to recall a public official from elected office is not a power reserved to the states under the Tenth Amendment because it "could only 'reserve' that which existed before," and thus 'no state can say, that it has reserved, what it never possessed" at the time of the Founding) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 802 (1995)); *see also*

*Payne v. 35th Legislature*                     2024 VI 13
S. Ct. Civ. No. 2023-0126
Opinion of the Court
Page 23 of 28

Kira L. Klatchko, *The Progessivist Origins of the 2003 California Gubernatorial Recall,* 35 MCGEORGE L. REV. 701, 702-03 (2004); Timothy Zick, *The Consent of the Governed: Recall of United States Senators,* 103 DICK. L. REV. 567, 602-03 (1999).  Importantly, the few courts to consider the question repeatedly determined that recall by the voters and expulsion or removal by a legislative body are complementary rather than inconsistent powers, with recall provisions designed not to eliminate the power of expulsion or removal from the legislature but rather calculated to grant a new additional power to the voters. *See, e.g., Walsh v. City Council of Trenton*, 186 A. 818, 820 (N.J. 1936); *Hilzinger v. Gillman*, 105 P. 471, 473 (Wash. 1909).

¶ 34    The plain text of section 12(c) provides further support for this interpretation. The Revised Organic Act does not confer upon the people  an unlimited power to recall any elected official in the Virgin Islands for any reason. Rather, section 12(c)(1) specifies that "[t]he grounds for recall are any of the following: lack of fitness, incompetence, neglect of duty, or corruption."  48 U.S.C. § 1593(1).  However, as explained above, the expulsion power developed in both England and the United States was to provide a legislative body with the power to enforce its own internal rules. Section 12(c)(1), however, is simultaneously broader by allowing a recall for grounds other than violation of legislative rules, and narrower by not specifying violation of the rules as an independent basis for a recall election. There may certainly be some cases where a rules violation would meet the section 12(c)(1) criteria for recall; for instance, a legislator accepting bribes has likely violated the body's ethics rules and engaged in "corruption." Yet it is noteworthy that the original purposes of the expulsion power—punishing members for violations of any of its rules, including those which may relate only to matters such as decency and decorum rather than unethical or illegal conduct—are not among the permissible purposes for calling a recall election. This omission provides powerful proof that the Revised Organic Act contemplates the power to

recall serving as a complement to, rather than a substitute for, the Legislature's expulsion power.[9]

¶ 35    Likewise, the Revised Organic Act does not permit the recall of every elected official at any time. Pursuant to section 12(c)(6),

> No recall election shall be held with respect to an elected public official—
>     (A) during the first year of the first term of office of the official; or
>     (B) less than 3 months before a general election for the office.

48 U.S.C. § 1593(c)(6)(A)-(B).  The purpose of these limitations is clear.  "The only logical reason . . . for requiring the electors to wait one year before petitioning for a recall election is to prevent premature action on their part in voting to remove a newly elected official before having had sufficient time to evaluate the soundness of his political policies and decisions."[10] *In re Bower*, 242 N.E.2d 252, 255 (Ill. 1968). Likewise, the prohibition on a recall election less than three months before a general election for the same office is predicated on the idea that "[t]he electorate will have its opportunity to vote soon enough without incurring the expense of any additional costs" stemming from a recall election.  *Committee to Recall Theresa Casagrande v. Casagrande*, 701 A.2d 439, 441 (N.J. Super. Ct. 1997).

¶ 36    But while these limitations are both prudent and logical if the recall power is viewed as a "populist form of impeachment," Klatchko, 35 MCGEORGE L. REV. at 703, they lead to wholly absurd results if the recall power displaces expulsion and serves as the <u>only</u> means to remove an

---

[9] In fact, the plaintiffs, while claiming that the right to recall serves as the exclusive mechanism to remove a member of the Legislature from office, simultaneously assert that "the alleged conduct attributed to [Payne] would not meet the requirements for recall under this provision." (Plaintiffs' Br. 11.)

[10] The one-year limitation, of course, would not apply to Payne specifically since his expulsion happened approximately a year and a half into his second term of office.  Its existence and potential application, however, is certainly relevant to our consideration of Payne's argument that recall constitutes the *only* method to ever remove an elected legislator from office.

elected official from office. A first-term legislator charged with first-degree murder one week after being sworn-in and detained while awaiting trial would remain a member of the Legislature for an entire year, drawing a salary while in jail, as no recall election may be called during the first year of that legislator's term of office. A legislator found taking bribes, but who hid the corruption well enough so that it did not become discovered until three months before a general election, would continue to hold office for the remainder of the term. The drafters of the Revised Organic Act could not possibly have intended that granting the power to the voters to initiate a recall and placing reasonable limitations on the recall power to avoid abuse and promote fiscal responsibility would remove the authority of the Legislature to wield its inherent expulsion power to address these and other situations.

*c. Interference with Legislative Power*

¶ 37    Having determined that the Legislature may enact an ethics code to regulate members' conduct and enforce its provisions through its inherent expulsion power, we now consider whether permitting judicial review of Payne's expulsion constitutes undue judicial interference in the Legislature's internal affairs. The plaintiffs do not directly address this consideration in their brief, invoking only the general principle from *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), that "[i]t is emphatically the province and duty of the judicial department to say what the law is." (Plaintiffs' Br. 9.)  But this is ultimately a *non-sequitur*, in that there are constitutional and other limits on when, and under what circumstances, a court may permissibly "say what the law is." This is evident from *Marbury* itself, where the Supreme Court of the United States determined that it could not issue the requested writ of mandamus because it lacked subject-matter jurisdiction over the case. While the absence of justiciability may not serve as a jurisdictional bar, it nevertheless establishes sufficient reason for a court to decline to "say what the law is" in a

particular lawsuit.

¶ 38    Here, we conclude that the claims raised in the plaintiffs' lawsuit are not justiciable. In their complaint, the plaintiffs essentially allege that the Legislature (1) failed to abide by a requirement in Legislative Rule 810(h)(6) requiring an initial ethics complaint to be signed under penalty of perjury; and (2) acted "arbitrarily" and "capriciously" in amending Bill No. 34-0287 to change the penalty to expulsion.  (J.A. 37-38.)  But courts have held, in persuasive yet non-binding decisions, that attempts by courts to interpret and apply internal legislative rules or to review the propriety of legislative procedures constitute <u>precisely</u> the sort of infringement on the right to the Legislature to govern its own affairs as a co-equal branch of government that renders a matter non-justiciable.  *See, e.g., Brown v. Hansen,* 973 F.2d 1118, 1123 (3d Cir. 1992); *Mapp*, 882 F.2d at 55; *Democratic Party of the V.I. v. St. Thomas-St. John Bd. of Elections*, Civ. No. 2017-44, 2017 WL 4700728, at *4 (D.V.I. Oct. 19, 2017) (unpublished); *Bryan v. Liburd*, 35 V.I. 46, 51-52 (V.I. Super. Ct. 1996).  In fact, at the January 10, 2022 oral argument before the Superior Court, the plaintiffs conceded through their counsel that interpretations of the Legislature's rules "are nonjusticiable" and that "[i]f they want to violate their own rules and not follow their own rules or make rules up as they go, or whatever it is . . . that is under separation of powers" and "[t]hose items would be clearly nonjusticiable."  (J.A. 120.)

¶ 39    Yet we need not even go so far as to determine whether a court can or cannot ever interpret or apply legislative rules or procedures because there is no need to do so in this case.  As this Court previously recognized, "one legislature cannot abridge the powers of a succeeding legislature by passing a law, adopting a rule, entering a contract, or taking some other action that irrevocably surrenders an essential attribute of its sovereignty."  *Save Coral Bay, Inc. v. Bryan*, 76 V.I. 505, 511 (V.I. 2022) (internal quotation marks omitted).  In other words, the Legislature cannot "enact[]

*Payne v. 35th Legislature*          2024 VI 13
S. Ct. Civ. No. 2023-0126
Opinion of the Court
Page 27 of 28

unrepealable or unmodifiable super-legislation." *Id.* at 513. Thus, as a matter of law the Legislature may constitutionally adopt a set of rules—as it did when it passed Resolution No. 1880—and then explicitly or even implicitly disregard them in a particular case, as the plaintiffs allege it did when it passed Resolution No. 1891. *Accord, id.* at 512 (holding that the Legislature possessed the authority to enact a comprehensive statutory scheme for approval of coastal zone management permits, and then later enact a law approving a specific permit outside of that process). And to the extent the plaintiffs assert that the Legislature's actions violated Payne's due process rights under the Fifth Amendment to the United States Constitution—a claim made in their motion for injunctive relief but not in their complaint—the Supreme Court of the United States has already held that "an unlawful denial by state action of a right to state political office is not a denial of a right of property or of liberty secured by the due process clause."[11] *Snowden v. Hughes*, 321 U.S. 1, 7 (1944); *see Cave v. Missouri ex rel. Newell*, 246 U.S. 650 (1918); *Taylor v. Beckham*, 178 U.S. 548 (1900); *Wilson v. North Carolina*, 169 U.S. 586 (1898); *see also Sweeney v. Tucker*, 375 A.2d 698, 713 (Pa. 1977) ("An elected office is a public trust, not the private domain of the officeholder. A member of the Legislature has a profound responsibility to represent his constituents in the formulation of public policy in this state. He holds office for the benefit of his constituents and cannot justifiably rely on a private need or expectation in holding office.").

¶ 40      Given this authority precluding most of the plaintiffs' claims as a matter of law, their only remaining claims—that the Legislature and its members somehow acted arbitrarily or capriciously in doing what they did—inherently requests that this Court substitute its own judgment for that of the 14 senators who voted to expel Payne. Because doing so would infringe on the authority of

---

[11] The plaintiffs do not assert, in their complaint or elsewhere, a claim that the Legislature's actions violated the free-standing due process clause found in section 3 of the Revised Organic Act.

the Legislature to administer its own affairs as a co-equal branch of government, we grant the motion to dismiss the lawsuit in its entirety as nonjusticiable.

### III. CONCLUSION

¶ 41    We conclude that the Speech or Debate Clause of the Revised Organic Act provides absolute immunity from suit to the Senate President, but not to the Legislature as an institution. Moreover, Payne's claim for money damages is barred pursuant to section 2(b) of the Revised Organic Act since it cannot sound in contract and the government has not waived its sovereign immunity for any tort claim based on his expulsion.  With respect to the portion of the plaintiffs' lawsuit not precluded by those immunity provisions, we find the plaintiffs' lawsuit nonjusticiable because the Legislature possesses the authority to impose an ethics code on its members as a condition to continuing to hold office and to enforce it through the power of expulsion, and the plaintiffs' sole challenge to the Legislature's actions can only be adjudicated by requiring this Court to substitute its judgment for that of the 14 senators who voted to expel Payne from the Legislature. Accordingly, we grant the Legislature's motion to dismiss, and dismiss the plaintiffs' lawsuit in its entirety with prejudice.

**Dated this 22nd day of March, 2024.**

**BY THE COURT:**

/s/ Rhys S. Hodge_____
**RHYS S. HODGE**
**Chief Justice**

**ATTEST:**

**VERONICA J. HANDY, ESQ.**
**Clerk of the Court**

**By:** /s/ Jahkyda Coakley_____
        **Deputy Clerk**

**Dated**: March 22, 2024_____